## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

WARREN BASCH, Individually and on Behalf
of All Others Similarly Situated,

Plaintiffs,

v.

CURALEAF HOLDINGS, INC., CURALEAF,
INC., JOSEPH LUSARDI, NEIL DAVIDSON,
and JONATHAN FAUCHER,

Defendants.

Case No. 1:19-cv-04486-BMC

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Warren Basch ("Lead Plaintiff") and additional party plaintiffs W. Frank Klun and Laura Klun, individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of filings by Curaleaf Holdings, Inc. ("Curaleaf Holdings" or the "Company") and its predecessor companies with the United States Securities and Exchange Commission ("SEC"), the OTC Markets ("OTCQX"), Canadian Securities Exchange ("CSE") and the Canadian System for Electronic Document Analysis and Retrieval ("SEDAR"), as well as press releases and other public statements issued by the company and posted on the websites https://www.curaleaf.com and https://www.ir.curaleaf.com, and media reports about the

1

Company.   Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased or acquired publicly traded Curaleaf Holdings securities on the OTCQX between November 21, 2018 and July 22, 2019 inclusive (the "Class Period").  Plaintiff seeks to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers.

2.      During the Class Period, Defendants knowingly and/or recklessly misled investors by advertising its cannabidoil ("CBD") products as beneficial for health and extensively advertising Curaleaf Holdings' expansion in the U.S. market. Defendants primarily promulgated these statements in press releases, securities exchange filings and in the media.  However, these statements were misleading because Defendants failed to disclose to investors that CBD was ***not approved*** by the U.S. Food and Drug Administration and subject to regulatory rules that, by Defendant Neil Davidson's own admission in August 2019, were unclear as to exactly what cannabis products could be sold and how they could be marketed.

3.      Curaleaf Holdings' and Curaleaf's statements to the effect that its CBD products were beneficial for human and animal health, could treat medical conditions and could be used as dietary supplements, and its statements as to the Company's rapid growth, coupled with

Defendants' failure to warn investors of potential regulatory issues which would reduce or stymie Curaleaf Holdings' sales activities in the U.S., misled the investing public.

4.      In particular, Curaleaf Holdings' filings painted a picture of a fast-growing, successful company selling a cutting-edge product with health benefits, without adequate acknowledgement of legal and regulatory risks. This included marketing CBD products sold by Curaleaf Holdings and Curaleaf for humans and animals as safe, effective, of a high quality and having health/medical benefits, without disclosing in marketing materials and press releases that these CBD products were not FDA approved (in fact, none of Curaleaf Holdings and Curaleaf's cannabis products were FDA approved). In this way, Defendants created the misleading impression that the CBD products were safe, effective, had the health and medical benefits advertised and met medical/scientific standards when, in fact, the products had not been approved by the federal agency responsible for certifying the safety, effectiveness and quality of food and medical products sold in the U.S. This caused the price of Curaleaf Holdings' securities to be artificially inflated throughout the Class Period.

5.      On April 23, 2019, in its Management Discussion and Analysis for 2017 and 2018, Curaleaf Holdings disclosed, for the first time since it launched its CBD product line, the fact that CBD is not approved by the FDA and could be subject to FDA enforcement action. Nevertheless, Curaleaf Holdings continued to promote its CBD products as of a high quality, safe and having health benefits in its press releases and on the Curaleaf website.

6.      Then, on July 22, 2019, the FDA sent a warning letter to Curaleaf that, in violation of federal law, Curaleaf was selling unapproved, new drugs and misbranded drugs, marketing CBD products as dietary supplements and selling unapproved animal drugs. As a result of this

letter, Curaleaf Holdings shares fell $0.58 per share or 7.27% to close at $7.40 per share on July 23, 2019.

7.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's stock, Lead Plaintiff and Class members suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.  This Court has personal jurisdiction over each Defendant named herein because each Defendant has sufficient  minimum contacts with this District so as to render the exercise of jurisdiction by the Court  permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred this District.

11.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the facilities of a national securities exchange.

### III.   <u>PARTIES</u>

12.   Lead Plaintiff purchased Curaleaf Holdings securities during the Class Period and, as a result, was economically damaged thereby.

13.   Additional party plaintiffs W. Frank Klun and Laura Klun also purchased Curaleaf Holdings securities during the Class Period and, as a result, were economically damaged thereby.

14.   Defendant Curaleaf Holdings describes itself as "the leading vertically integrated multi-state cannabis operator in the United States." It operates 50 cannabis dispensaries across 12 states, has 14 cannabis cultivation sites and 13 processing sites, and has over 1,150,000 active wholesale cannabis dispensary accounts. Curaleaf Holdings is incorporated in British Columbia, Canada and maintains its principal place of business at 301 Edgewater Place, Suite 405, Wakefield, Massachusetts 01880. Curaleaf Holdings operates within this judicial district. Curaleaf Holdings' stocks trade on the OTCQX under the ticker symbol "CURLF" and on the CSE under the ticker symbol "CURA." Curaleaf Holdings is the parent company of Defendant Curaleaf Inc. ("Curaleaf"). Defendant Curaleaf operates and/or manages some of Curaleaf Holdings' operations within the U.S. The FDA letter dated July 22, 2019 was addressed to Curaleaf. Curaleaf is, upon information and belief, incorporated in Delaware and has its principal place of business at 301 Edgewater Place, Suite 405, Wakefield, Massachusetts 01880.

15.   Defendant Joseph Lusardi ("Lusardi") was the Company's Chief Executive Officer ("CEO") during the Class Period.

16.   Defendant Neil Davidson ("Davidson") was the Company's Chief Financial officer ("CFO") since January 2019.

17.     Defendant Jonathan Faucher ("Faucher") was the Company's CFO from January 2017 until February 2019.   He currently serves as the Chief Operating Officer of Curaleaf's Florida division.

18.     Defendants Lusardi, Davidson and Faucher are collectively referred to herein as the "Individual Defendants."

19.     Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and the omissions alleged herein;

d.      was aware of and/or recklessly disregarded the fact that the Company was issuing false and misleading statements and omitting to disclose material information to investors; and/or

e.      approved or ratified false and misleading statements, and the decision to omit to disclose certain information, in violation of the federal securities laws.

20.     Furthermore, because of each of the Individual Defendants' positions within the Company, they had access to undisclosed, confidential, and proprietary information about Curaleaf Holdings' business, operations, operational trends,  financial statements, markets and present and future business prospects via access to internal  corporate documents (including the

6

Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.     As officers of a company whose securities were, and are, traded on the OTCQX pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of the Company's reports to the CSE, SEDAR, OCTQX and SEC, press releases, and presentations to institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew, or should have known, that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations made were materially false

7

and/or misleading. The Individual Defendants are liable for the misleading statements alleged herein, as each of the misleading statements were "group-published" information and the result of the collective actions of the Individual Defendants.

23.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Curaleaf Holdings securities because they disseminated materially false and misleading statements and/or concealed material adverse facts. The scheme: (i) deceived the investing public regarding Curaleaf Holdings' business, operations, management and the intrinsic value of its stock; and (ii) caused Lead Plaintiff and other shareholders to purchase Curaleaf Holdings' stock at artificially inflated prices.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Cannabidiol ("CBD") and its Uses

24.     Cannabidiol ("CBD") is a chemical compound contained in plants in the cannabscae family.  The FDA has described cannabis and CBD as follows:

> Cannabis is a plant of the Cannabascae family and contains more than eighty biologically active chemical compounds. The most commonly known compounds are delta-9-tetrahydrocannabinol (THC) and cannabidiol (CBD). Parts of the Cannabis sativa plant have been controlled under the Controlled Substances Act (CSA) since 1970 under the drug class "Marihuana" (commonly referred to as "marijuana") [21 U.S.C. 802(16)]. "Marihuana" is listed in Schedule I of the CSA due to its high potential for abuse, which is attributable in large part to the psychoactive effects of THC, and the absence of a currently accepted medical use of the plant in the United States.

(FDA, "FDA Regulation of Cannabis and Cannabis-Derived Products, Including Cannabidiol", https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd).

8

25.     The cannabscae family includes *cannabis indicia* and *cannabis sativa*.   While marijuana can come from either family, hemp is only a member of the latter family.   Marijuana and hemp are also distinctly different in terms of their chemical composition.   Marijuana, for example, has a much higher level of THC, the chemical associated with its psychoactive effect, than hemp (up to 30% TCH in marijuana and less than 0.3% TCH in hemp). However, they both contain CBD, and can both be used to make CBD products, such as oils. (Todd Campbell, "Hemp vs. Marijuana: What's the Difference?",   https://www.fool.com/investing/2019/02/09/hemp-vs-marijuana-whats-the-difference.aspx).

26.     Indeed, CBD has recently been incorporated into a wide variety of products.   For example, in topical creams and lotions, beverages, dietary supplements and tinctures, vape pens containing CBD oil cartridges, bath bombs, pet treats and cosmetics.   While those who sell CBD products – like Curaleaf Holdings – routinely extoll CBD's purported health benefits and ability to treat a range of health issues, there is significant debate as to the scientific accuracy of these claims.   For example, prior to the FDA's letter to Curaleaf on July 22, 2019, Curaleaf had made claims in relation to its CBD products which included that CBD is: an effective treatment for chronic pain, anxiety, depression, ADHD, Parkinson's disease, Alzheimer's disease; a beneficial supplement to opioid medications; counteracts the growth and spread of cancer and kills breast cancer cells; lowers blood pressure and bad cholesterol while promoting good cholesterol; and lowers anxiety in pets.

27.     However, many commentators, including the FDA, point out that there is little or no scientific evidence of the health benefits of CBD, or whether it is suitable for the treatment of many conditions its retailers claim it is.   Even more seriously, the FDA has raised concerns about

the safety of CBD, warning consumers that "we have seen only limited data about CBD's safety and these data point to real risks that need to be considered.  As part of the drug review and approval process for the prescription drug containing CBD, it was determined that the risks are outweighed by the benefits of the approved drug for the particular population for which it was intended."  (FDA, "What You Need to Know (And What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD"), https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis).

28.      In particular, the FDA has stated that, when reviewing the drug Epidiolex (used to treat certain seizure disorders), the *only* FDA-approved product containing CBD, it found that CBD can cause liver injury, can interact with other medications and may adversely affect male fertility.  The FDA has also raised concerns about the risks from cumulative exposure to CBD from multiple products, the effects of CBD on special populations like pregnant women and the elderly and the safety of use of CBD by animals.  Finally, in relation to non-FDA approved CBD products (as mentioned, the only FDA approved CBD product is Epidiolex), the FDA has cautioned that there may be no accurate determination of the correct dosage, drug interactions and side effects, and quality.  For example, there have been reports of CBD products containing unsafe contaminants like pesticides, heavy metals or THC, and FDA testing of some CBD products found they do not contain the levels of CBD they claim. (FDA, "What You Need to Know (And What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD," https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis).

**B.**     **Cannabis and CBD laws in the United States**

29.     At the state level, between 1998 and 2018, 33 states and Washington D.C. legalized the use of medical marijuana, with possession limits varying between 1-8 oz. and 6-12 plants and use limits varying between 10 to 90 days. (ProCon.org, "Legal Medical Marijuana States and DC," https://medicalmarijuana.procon.org/legal-medical-marijuana-states-and-dc/).  Between 2012 and 2018, 11 of those states and Washington D.C. also legalized recreational marijuana, with possession limits varying between 1-2.5 ounces and 4-18 plants, with some states also limiting the amount that may be possessed in concentrate, solid, liquid and hash forms (ProCon.org, "Legal Recreational Marijuana States and DC," https://marijuana.procon.org/legal-recreational-marijuana-states-and-dc/).   Between 2014 and 2018, 17 states (almost all of which have not legalized recreational or medicinal marijuana in general) legalized the use and possession of CBD.

30.     The level of legalization varies between these states; some simply provide an affirmative defense from prosecution for those who suffer certain debilitating conditions, others only allow prescription by a physician or distribution by licensed parties.  Many laws also require that CBD products contain specific percentages of CBD and below a certain amount of THC. (ProCon.org,    "States    with    Legal    Cannabidiol    (CBD)    (as    of    July    12,    2019)," https://marijuana.procon.org/legal-recreational-marijuana-states-and-dc/).   Many, but not all, of these states include "hemp" in the definitions of marijuana used in the relevant legislation.

31.     In addition, between 2016 and 2019, 47 states have enacted hemp laws; some only authorizing research into the industrial cultivation of hemp, others also authorizing industrial hemp cultivation and setting out regulatory regimes for growers (often only on a pilot basis). Common regulatory requirements across various states for hemp growers include oversight by a particular

state governmental body and registration, licensing and reporting requirements for growers. (National Conference of State Legislatures, "State Industrial Hemp Statutes" (http://www.ncsl.org/research/agriculture-and-rural-development/state-industrial-hemp-statutes.aspx).

32.    At federal level, the Controlled Substances Act ("CSA") was enacted in 1970, establishing U.S. federal drug policy.  Marijuana is classified as a Schedule 1 controlled substance in the CSA, the most tightly restricted category of drugs which were considered to have a high potential for abuse and no currently accepted medical use. (21 USCS § 812).  Until December 20, 2018, the definition of marijuana included hemp (although, as mentioned, hemp and marijuana are in fact different plants from the same family). The CSA provides for substantial terms of imprisonment and fines for those who possess, manufacture, distribute or dispense controlled substances.   The CSA does provide for a registration process which would render some manufacture, distribution and dispensation permissible and allows for possession of controlled substances with a prescription from a physician.

33.    On July 5, 2011, the U.S. Drug Enforcement Administration ("DEA") proposed a new rule for tracking marijuana extract in accordance with international treaties.  The proposed rule was to define marijuana extract as "extracts that have been derived from any plant of the genus cannabis and which contain cannabinols and cannabidiols" and confirm marijuana extracts were controlled substances under Schedule 1 of the CSA.  This proposed rule eventually went into effect in 2017 (discussed below) (DEA, "Establishment of a New Drug Code for Marihuana Extract",  https://www.federalregister.gov/documents/2011/07/05/2011-16800/establishment-of-a-new-drug-code-for-marihuana-extract).

34.     On August 29, 2013, U.S. Attorney General James M. Cole issued a memorandum ("Cole Memorandum").  The Cole Memorandum set out specific priorities for prosecutors and law enforcement in relation to marijuana (preventing distribution to minors; preventing marijuana revenue going to criminal enterprises; preventing marijuana diversion to states where it is illegal; preventing state authorized marijuana activity from being used as a cover-up for illegal activity; preventing violence; preventing drugged driving and other public health concerns; preventing growing marijuana on public lands and safety/environmental issues; preventing possession or use on federal property).  Outside of these priorities, the Cole Memorandum advised the federal government to exercise prosecutorial discretion in enforcing federal marijuana laws.

35.     On December 14, 2016, the DEA announced a new rule (which finalized the rule proposed in July 2011 and went into effect on January 13, 2017) to more effectively track quantities of marijuana extract (including CBD) in accordance with international United Nations treaty obligations. The announcement confirmed that "[e]xtracts of marijuana will continue to be treated as Schedule 1 controlled substances" and that marijuana extract meant "an extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, other than the separated resin (whether crude or purified) obtained from the plant."  Accordingly, the DEA announcement confirmed CBD was a controlled substance in Schedule 1 of the CSA. (DEA, "Establishment of a New Drug Code for Marijuana Extract, https://www.federalregister.gov/documents/2016/12/14/2016-29941/establishment-of-a-new-drug-code-for-marihuana-extract).  As a result, a number of large retailers selling hemp-derived CBD products "stopped selling those products almost overnight." (Law360, "2020 May Be the Year of

the Great CBD Market Correction" (https://www.law360.com/classaction/articles/1225500/2020-may-be-the-year-of-the-great-cbd-market-correction).

36.     On January 4, 2018, U.S. Attorney General Jeff Sessions rescinded the Cole Memorandum by issuing a new memorandum ("Sessions Memorandum").   The Sessions Memorandum rescinded the Cole Memorandum and instructed prosecutors to follow "well-established" principles of weighing all relevant considerations (including federal law enforcement priorities, the seriousness of the crime, the deterrent effect of criminal prosecution and the cumulative impact of particular crimes on the community) in deciding whether to prosecute marijuana offenses.

37.     On December 20, 2018, the Agriculture Improvement Act of 2018 ("2018 Farm Act") was enacted.  The Farm Act sets out U.S. agricultural and nutritional policy for a five year period.  It amended the CSA by removing hemp (defined in the 2018 Farm Bill as any part of the *Cannabis sativa L.* plant which contains 0.3% or less THC from the definition of marijuana, thereby removing hemp from Schedule 1 of the CSA. The 2018 Farm Act allows hemp to be grown by (1) a pilot program conducted by an institute of higher education, (2) a pilot program conducted by a state department of agriculture or (3) in accordance with a U.S. Department of Agriculture-approved or created plan to regulate and monitor production.  Such plans will provide for collecting information about the hemp crop, procedure for disposal of illegal plants and products and THC testing requirements. (The National Law Review, "2018 Farm Bill Legalizes Hemp, but Obstacles to Sale of CBD Products Remain, https://www.natlawreview.com/article/2018-farm-bill-legalizes-hemp-obstacles-to-sale-cbd-products-remain).

14

C.     **Cannabis and CBD regulation by the FDA**

38.     On December 20, 2018, the day the 2018 Farm Bill was signed into law, the FDA

issued a statement confirming that, despite the removal of hemp from the CSA, the FDA retained

the authority to regulate cannabis or cannabis-derived compounds under the Federal Food, Drug

and Cosmetic Act and section 351 of the Public Health Service Act, including CBD products.  The

FDA is a federal body which is crucial in maintaining public safety when it comes to medical,

veterinary, cosmetic and food products.  The FDA:

> is responsible for protecting the public health by ensuring the safety,
> efficacy and security of human and veterinary drugs, biological products,
> and medical devices; and by ensuring the safety of our nation's food
> supply, cosmetics and products that emit radiation…FDA is responsible
> for advancing the public health by helping to speed innovations that make
> medical products more effective, safer, and more affordable and by
> helping the public get the accurate, science-based information they need to
> use medical products and foods to maintain and improve their health.

(https://www.fda.gov/about-fda/what-we-do).

39.     In its statement of December 20, 2018, the FDA detailed its ongoing regulation of

cannabis products, including CBD products, and its intention to take enforcement action in relation

to the illegal sale of CBD products:

> We're aware of the growing public interest in cannabis and cannabis-
> derived products, including cannabidiol (CBD)…[W]e treat products
> containing cannabis or cannabis-derived compounds as we do any other
> FDA-regulated products — meaning they're subject to the same
> authorities and requirements as FDA-regulated products containing any
> other substance. This is true regardless of the source of the substance,
> including whether the substance is derived from a plant that is classified as
> hemp under the Agriculture Improvement Act. To help members of the
> public understand how the FDA's requirements apply to these products,
> the FDA has maintained a webpage with answers to frequently asked

15

questions, which we intend to update moving forward to address questions regarding the Agriculture Improvement Act and regulation of these products generally.

In view of the proliferation of products containing cannabis or cannabis-derived substances, the FDA will advance new steps to better define our public health obligations in this area. We'll also continue to closely scrutinize products that could pose risks to consumers. Where we believe consumers are being put at risk, the FDA will warn consumers and take enforcement actions.

In particular, we continue to be concerned at the number of drug claims being made about products not approved by the FDA that claim to contain CBD or other cannabis-derived compounds. Among other things, **the FDA requires a cannabis product (hemp-derived or otherwise) that is marketed with a claim of therapeutic benefit, or with any other disease claim, to be approved by the FDA for its intended use before it may be introduced into interstate commerce**. This is the same standard to which we hold any product marketed as a drug for human or animal use**. Cannabis and cannabis-derived products claiming in their marketing and promotional materials that they're intended for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases (such as cancer, Alzheimer's disease, psychiatric disorders and diabetes) are considered new drugs or new animal drugs and must go through the FDA drug approval process for human or animal use before they are marketed in the U.S.** Selling unapproved products with unsubstantiated therapeutic claims is not only a violation of the law, but also can put patients at risk, as these products have not been proven to be safe or effective. This deceptive marketing of unproven treatments raises significant public health concerns, as it may keep some patients from accessing appropriate, recognized therapies to treat serious and even fatal diseases.

Additionally, it's unlawful under the FD&C Act to introduce food containing added CBD or THC into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived. This is because both CBD and THC are active ingredients in FDA-approved drugs and were the subject

16

of substantial clinical investigations before they were marketed as foods or dietary supplements. Under the FD&C Act, it's illegal to introduce drug ingredients like these into the food supply, or to market them as dietary supplements. This is a requirement that we apply across the board to food products that contain substances that are active ingredients in any drug.

We'll take enforcement action needed to protect public health against companies illegally selling cannabis and cannabis-derived products that can put consumers at risk and are being marketed in violation of the FDA's authorities.

40.    The FDA webpage referred to in the statement set out above contains more information about the FDA's concerns about cannabis (and, in particular, CBD) products and its regulatory regime.  It explains that in order to sell CBD products, retailers must comply with a number of federal and state laws. In relation to cannabis derived drugs, it states the following:

Under the FD&C Act, any product intended to have a therapeutic or medical use, and any product (other than a food) that is intended to affect the structure or function of the body of humans or animals, is a drug.  Drugs must generally either receive premarket approval by FDA through the New Drug Application (NDA) process or conform to a "monograph" for a particular drug category, as established by FDA's Over-the-Counter (OTC) Drug Review.  CBD was not an ingredient considered under the OTC drug review.  An unapproved new drug cannot be distributed or sold in interstate commerce.

FDA continues to be concerned at the proliferation of products asserting to contain CBD that are marketed for therapeutic or medical uses although they have not been approved by FDA. Often such products are sold online and are therefore available throughout the country. Selling unapproved products with unsubstantiated therapeutic claims is not only a violation of the law, but also can put patients at risk, as these products have not been proven to be safe or effective. This deceptive marketing of unproven treatments also raises significant public health concerns, because patients and other consumers may be influenced not to use approved therapies to treat serious and even fatal diseases.

17

Unlike drugs approved by FDA, products that have not been subject to FDA review as part of the drug approval process have not been evaluated as to whether they work, what the proper dosage may be if they do work, how they could interact with other drugs, or whether they have dangerous side effects or other safety concerns.

The agency has and will continue to monitor the marketplace and take action as needed to protect the public health against companies illegally selling cannabis and cannabis-derived products that can put consumers at risk and that are being marketed for therapeutic uses for which they are not approved.

(FDA, "FDA Regulation of Cannabis and Cannabis-Derived Products, Including Cannabidiol (CBD)"       https://www.fda.gov/news-events/public-health-focus/fda-regulation-cannabis-and-cannabis-derived-products-including-cannabidiol-cbd).

41.     In relation to drugs derived from cannabis, the FDA website further explains it has approved ***only one drug*** containing CBD (Epidiolex, for the treatment of seizures) and two drugs containing THC (Marinol and Syndros, for treatment of weight loss in AIDS patients).  Other than this, "FDA has not approved a marketing application for cannabis for the treatment of any disease or condition and thus has not determined that cannabis is safe and effective for any particular disease or condition."

42.     In relation to dietary supplements, the FDA website explains that CBD products cannot be sold as dietary supplements:

**9. Can THC or CBD products be sold as dietary supplements?**

A. No. Based on available evidence, FDA has concluded that THC and CBD products are excluded from the dietary supplement definition under section 201(ff)(3)(B) of the FD&C Act [21 U.S.C. § 321(ff)(3)(B)]. Under that provision, if a substance (such as THC or CBD) is an active ingredient in a drug product that has been approved under section 505 of the FD&C

18

Act [21 U.S.C. § 355], or has been authorized for investigation as a new drug for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public, then products containing that substance are excluded from the definition of a dietary supplement. FDA considers a substance to be "authorized for investigation as a new drug" if it is the subject of an Investigational New Drug application (IND) that has gone into effect. Under FDA's regulations (21 CFR 312.2), unless a clinical investigation meets the limited criteria in that regulation, an IND is required for all clinical investigations of products that are subject to section 505 of the FD&C Act.

There is an exception to section 201(ff)(3)(B) if the substance was "marketed as" a dietary supplement or as a conventional food before the drug was approved or before the new drug investigations were authorized, as applicable. However, based on available evidence, FDA has concluded that this is not the case for THC or CBD.

43.     In relation to food, the FDA website further explains that it is illegal to sell human or animal food containing CBD in interstate commerce:

**10. Is it legal, in interstate commerce, to sell a food (including any animal food or feed) to which THC or CBD has been added?**

A. No. Under section 301(ll) of the FD&C Act [21 U.S.C. § 331(ll)], it is prohibited to introduce or deliver for introduction into interstate commerce any food (including any animal food or feed) to which has been added a substance which is an active ingredient in a drug product that has been approved under section 505 of the FD&C Act [21 U.S.C. § 355], or a drug for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public. There are exceptions, including when the drug was marketed in food before the drug was approved or before the substantial clinical investigations involving the drug had been instituted or, in the case of animal feed, that the drug is a new animal drug approved for use in feed and used according to the approved labelling. However, based on available evidence, FDA has concluded that none of these is the case for THC or CBD. FDA has therefore concluded that it is a prohibited act to introduce or deliver for

19

introduction into interstate commerce any food (including any animal food or feed) to which THC or CBD has been added.

44.     In addition, in relation to using CBD products for pets and animals, the FDA website provides the following information cautioning against the use of such products:

We want to stress that FDA has not approved cannabis for any use in animals, and the agency cannot ensure the safety or effectiveness of these products. For these reasons, FDA cautions pet-owners against the use of such products and recommends that you talk with your veterinarian about appropriate treatment options for your pet.

Signs that your pet may be suffering adverse effects from ingesting cannabis may include lethargy, depression, heavy drooling, vomiting, agitation, tremors, and convulsions.

…[T]o date, FDA has not directly received any reports of adverse events associated with animals given cannabis products. However, adverse events from accidental ingestion are well-documented in scientific literature.

45.     Specifically in relation to hemp in animal food, the FDA also states:

All ingredients in animal food must be the subject of an approved food additive petition or generally recognized as safe (GRAS) for their intended use in the intended species. If an animal food contains an ingredient that is not the subject of an approved food additive petition or GRAS for its intended use in the intended species, that animal food would be adulterated under section 402(a)(2)(C)(i) of the FD&C Act [21 U.S.C. §342(a)(2)(C)(i)]. In coordination with state feed control officials, CVM also recognizes ingredients listed in the Official Publication (OP) of the Association of American Feed Control Officials (AAFCO) as being acceptable for use in animal food. At this time, there are no approved food additive petitions or ingredient definitions listed in the AAFCO OP for any substances derived from hemp, and we are unaware of any GRAS conclusions regarding the use of any substances derived from hemp in animal food.

…With respect to products labelled to contain "hemp" that may also contain THC or CBD, as mentioned above it is a prohibited act under

20

section 301(ll) of the FD&C Act to introduce or deliver for introduction into interstate commerce any animal food to which THC or CBD has been added.

46.     In summary, cannabis regulation, and more specifically CBD regulation, is – and was, during the Class Period – governed by a complex regime of laws and regulations at both federal and state levels, involving a number of guidelines, specifications and state and federal bodies which vary depending in the specific product and the state it is sold in. The complexity of this regime is precisely why CBD product manufacturers and retailers, like Curaleaf Holdings, must exercise caution in their operations.  In addition, by December 2018, if not earlier, the FDA had made explicit that marketing CBD products advertised to have health benefits, without FDA approval, was illegal and the FDA would take enforcement action against retailers doing so. However, in its zeal to expand as quickly as possible, Curaleaf Holdings knowingly and/or recklessly ignored or failed to adequately address the regulatory risks it faced, to the detriment of its investors.

### D.     Curaleaf Holdings Background Until Class Period

47.     Curaleaf Holdings was created as a result of what it referred to as a "reverse takeover" between Canadian company Lead Ventures, Inc. (previously named Maccabi Ventures, Inc.) and Delaware corporation PalliaTech, Inc. in 2018, and a number of subsequent acquisitions of cannabis manufacturers and retailers in the U.S.

48.     Maccabi Ventures, Inc. ("Maccabi") was incorporated in British Columbia, Canada on November 13, 2014.  Its initial public offering of common shares to purchasers in British Columbia, Alberta, Saskatchewan, Manitoba, Ontario and "elsewhere permitted by applicable law" took place on July 22, 2015. At the time, Maccabi engaged in "acquisition and exploration of

21

mineral properties," primarily focusing on copper exploration. It held an option to acquire a 100% interest in a property "comprised on one mineral tenure covering approximately 248.61 hectares" in British Columbia. (Listing Statement, 10/20/2015).  Maccabi's securities were listed on the CSE, and the IPO was completed on October 21, 2015.

49.     Financial statements filed with the SEC over subsequent years noted that Maccabi was continuing to explore its mineral reserves in order to determine whether the minerals were economically viable and that it often operated at a loss.

50.     On March 14, 2018, Maccabi changed its name to Lead Ventures, Inc. ("Lead"). Lead continued to be a "mineral exploration company" and, as at June 1, 2018, was evaluating results of initial exploration activities of a property in British Columbia and negotiating the potential acquisition of a gold property in Mongolia.

51.     On June 29, 2018, Lead announced it had entered into a non-binding Letter of Intent concerning a reverse take-over transaction with "a US-based company involved in the growing and distribution of cannabis and cannabis related products in the United States." The announcement explained that the U.S. company would take over Lead and the resulting company would list shares on the CSE.

52.      On July 26, 2018, Lead issued a press release confirming it had entered into an agreement with PalliaTech, Inc. (PalliaTech), "a private Delaware corporation and leading vertically integrated medical and wellness cannabis operator in the United States."  The press release explained that PalliaTech shareholders would acquire control over Lead and the listing of shares of the resulting company on the CSE. Lead would change its name, reclassify and consolidate its outstanding common shares and replace all its directors and officers with

PalliaTech's nominees. Lead would also become PalliaTech's indirect parent and sole voting stockholder.  The press release described PalliaTech as follows:

> PalliaTech is a leading vertically integrated medical and wellness cannabis operator in the United States. Headquartered in Wakefield, Massachusetts, PalliaTech is located in 10 states and operates 23 dispensaries, 10 cultivation sites and 9 processing sites with a focus on highly populated, limited license states, including New York, New Jersey, Florida and Massachusetts. PalliaTech leverages its extensive research and development capabilities to distribute cannabis products with the highest standard for safety, effectiveness, consistent quality and customer care. PalliaTech is committed to being the industry's leading resource in education and advancement through research and advocacy. Through its team of physicians, pharmacists, medical experts and industry visionaries, PalliaTech has created Curaleaf, a premier branded cannabis-based therapeutic offering, delivering premium quality medical cannabis in multiple product formats to patients through its network of branded retail dispensaries. Curaleaf's Florida operations are the first in the cannabis industry to receive the Safe Quality Food certification under the Global Food Safety Initiative, setting a new standard of excellence. For more information please visit www.palliatech.com and www.curaleaf.com.

53.    Subsequently, Lead changed its name to Curaleaf Holdings, Inc. (one of the defendants named in this complaint and defined above as "Curaleaf Holdings"), and PalliaTech changed its name to Curaleaf, Inc. (defined above as "Curaleaf").

54.    On September 5, 2018, Defendant Lusardi was quoted in the media in relation to the legal regime governing cannabis, acknowledging that the cannabis market was affected by federal law and regulation. In particular, an article by *Investors Business Daily* stated: "'Reconciling federal regulations on hemp, and hopefully removing it from the Controlled Substances Act, would help fuel the fast-growing CBD industry and open the market even further to customers who need it,'  Joe Lusardi, CEO of the cannabis company Curaleaf, said in an email."

(Investor's Business Daily, "Before You Invest in Marijuana, The SEC Says Do This First" https://www.investors.com/news/marijuana-stocks-sec-investment-tips-fraud-warning/).

55.    On October 26, 2018, Curaleaf Holdings issued a press release announcing that it had completed a business combination by way of a three cornered amalgamation. 1177679 B.C. Ltd., a wholly owned subsidiary of Curaleaf Holdings, amalgamated with 1177687 B.C. Ltd. to form a new company, which was then wound up into Curaleaf Holdings. Curaleaf Holdings became the parent company of Curaleaf. Curaleaf was described in the press release as follows:

> Curaleaf is a leading vertically integrated cannabis operator in the United States. Headquartered in Wakefield, Massachusetts, Curaleaf has a presence in 12 states. Curaleaf owns and operates 28 dispensaries, 12 cultivation sites and 9 processing sites with a focus on highly populated, limited license states, including Florida, Massachusetts, New Jersey and New York. Curaleaf leverages its extensive research and development capabilities to distribute cannabis products in multiple formats with the highest standard for safety, effectiveness, consistent quality and customer care. Curaleaf is committed to being the industry's leading resource in education and advancement through research and advocacy. Curaleaf's Florida operations were the first in the cannabis industry to receive the Safe Quality Food certification under the Global Food Safety Initiative, setting a new standard of excellence.

> For more information please visit www.curaleaf.com.

56.    Following the business combination completed on October 26, 2018, all shareholders holding individually more than 1% of the issued and outstanding shares in Curaleaf Holdings were subject to lock-up agreements. (Press release dated October 21, 2019).

57.    A press release dated October 26, 2018, contained the same description of Curaleaf set out above.  It also stated that:

24

The Company, including subsidiaries and managed entities, operates in Arizona, Connecticut, Florida, Maine, Maryland, Massachusetts, Nevada, New Jersey, New York and Oregon, with licensing pending in California and Pennsylvania. Through its team of physicians, pharmacists, medical experts and industry visionaries, the Company has developed the Curaleaf brand, a premium mainstream cannabis brand available in multiple states and product formats through its network of branded retail dispensaries.

58.   In its listing statement dated October 26, 2018 and filed with SEDAR that day, Curaleaf Holdings stated that it intended to operate within the U.S., and acknowledged the legal status of cannabis products in the U.S. The listing statement was filed with the CSE on November 2, 2018 and the OTCQX on January 15, 2019. It was therefore not filed on a U.S. securities exchange until January 2019.  The listing statement included the following discussion:

Curaleaf Holdings, Inc. will derive a substantial portion of its revenues from the cannabis industry in certain states of the United States, which industry is illegal under United States federal law. Curaleaf Holdings, Inc. will be directly involved (through its licensed subsidiaries) in the cannabis industry in the United States where local state laws permit such activities…

The United States federal government regulates drugs through the Controlled Substances Act (21 U.S.C.§ 811), which places controlled substances, including cannabis, in a schedule. Cannabis is classified as a Schedule I drug. Under United States federal law, a Schedule I drug or substance has a high potential for abuse, no accepted medical use in the United States, and a lack of accepted safety for the use of the drug under medical supervision. The United States Food and Drug Administration has not approved marijuana as a safe and effective drug for any indication.

In the United States marijuana is largely regulated at the state level. State laws regulating cannabis are in direct conflict with the federal Controlled Substances Act, which makes cannabis use and possession federally illegal. Although certain states authorize medical or adult-use cannabis production and distribution by licensed or registered entities, under U.S.

federal law, the possession, use, cultivation, and transfer of cannabis and any related drug paraphernalia is illegal and any such acts are criminal acts under federal law. The Supremacy Clause of the United States Constitution establishes that the United States Constitution and federal laws made pursuant to it are paramount and in case of conflict between federal and state law, the federal law shall apply.

On January 4, 2018, U.S. Attorney General Jeff Sessions issued a memorandum to U.S. district attorneys which rescinded previous guidance from the U.S. Department of Justice specific to cannabis enforcement in the United States, including the Cole Memorandum (as defined herein). With the Cole Memorandum rescinded, U.S. federal prosecutors have been given discretion in determining whether to prosecute cannabis related violations of U.S. federal law.

There is no guarantee that state laws legalizing and regulating the sale and use of cannabis will not be repealed or overturned, or that local governmental authorities will not limit the applicability of state laws within their respective jurisdictions. Unless and until the United States Congress amends the Controlled Substances Act with respect to medical and/or adult-use cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current federal law. If the federal government begins to enforce federal laws relating to cannabis in states where the sale and use of cannabis is currently legal, or if existing applicable state laws are repealed or curtailed, Curaleaf Holdings, Inc.'s business, results of operations, financial condition and prospects would be materially adversely affected.

59.     The listing statement further stated that:

Violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Resulting Issuer, including its reputation and ability to conduct business, its holding (directly or

26

indirectly) of medical and adult-use cannabis licenses in the United States, the listing of its securities on the CSE, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares.

60.     In relation to CBD specifically, the listing statement also stated:

**Regulatory Action and Approvals from the Food and Drug Administration**

The Resulting Issuer's cannabis-based products are supplied to patients diagnosed with certain medical conditions. However, the Resulting Issuer's cannabis-based products are not approved by the Food and Drug Administration ("FDA") as "drugs" or for the diagnosis, cure, mitigation, treatment, or prevention of any disease. Accordingly, the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug and Cosmetic Act ("FDCA").

In recent years, the FDA has issued letters to a number of companies selling products that contain CBD oil derived from hemp warning them that the marketing of their products violates the FDCA. FDA enforcement action against the Resulting Issuer could result in a number of negative consequences, including fines, disgorgement of profits, recalls or seizures of products, or a partial or total suspension of the Resulting Issuer's production or distribution of its products. Any such event could have a material adverse effect on the Resulting Issuer's business, prospects, financial condition, and operating results.

61.     Despite acknowledging the landscape of the legal regulation of cannabis products in the U.S. and the risk of FDA enforcement action, the listing statement also indicated Curaleaf Holdings, its predecessor corporations (Lead and PalliaTech) and its subsidiaries, had been gearing up to expand rapidly throughout the U.S.  The statement referred to the following acquisition agreements entered into by Curaleaf Holdings, its predecessors and/or its subsidiaries between 2016 and 2018:

(a)     In October 2018, an agreement to acquire the membership interests of a marijuana dispensary operating under a management services agreement with a non-profit entity holding a vertical marijuana license issued by the Arizona Department of Health Services.

(b)     In August 2018, an agreement to acquire the membership interests of a registered marijuana cultivator and dispensary licensed by the Massachusetts Department of Health.

(c)     In August 2018, an agreement to acquire the membership interests of a vertically integrated operator licensed to cultivate, process and dispense medical cannabis in Maryland, and rights to purchase another dispensary in Maryland owned by the same operator.

(d)     In April 2018, a subsidiary of Curaleaf Holdings (PalliaTech AZ) acquired a 100% interest in an LLC which operates four medical cannabis dispensaries and a cultivation facility in Arizona under management services agreements with four non-profit companies which hold licenses to process, cultivate and dispense medical cannabis in Arizona.

(e)     In December 2017, a subsidiary of Curaleaf Holdings (PT Nevada) agreed to acquire majority membership interests in an entity which, in turn, holds a majority interest in a cannabis dispensary in Las Vegas.

(f)     In August 2017, Curaleaf Holdings acquired a majority membership interest in an LLC which cultivates cannabis for Las Vegas dispensaries.

28

(g)    In November 2017, Curaleaf Holdings acquired a majority interest in an Oregon-based manufacturer of cannabis and in September 2018 had agreed to acquire the remaining interest in the corporation.

(h)    In December 2016, a subsidiary of Curaleaf Holdings (PalliaTech CT) agreed to acquire a majority of all outstanding membership units in a Delaware entity which owns a Connecticut based medical cannabis factory.  In October 2018, Curaleaf Holdings agreed to acquire the remaining membership units in this entity.

(i)    In January 2017, a subsidiary of Curaleaf Holdings (PalliaTech Florida) acquired a majority interest in the owner of a Florida medical cannabis facility. In September 2018, Curaleaf Holdings agreed to acquire a minority interest in the same entity.

(j)    In March 2018, Curaleaf Holdings acquired a majority interest in a vertically-integrated registered marijuana dispensary licensed by the Department of Health of the State of Massachusetts. In August 2018, Curaleaf Holdings agreed to acquire a further interest in the dispensary.

62.    On October 29, 2018, Curaleaf Holdings began trading on the CSE.  A press release on that date included a comment from Defendant Lusardi indicating Curaleaf Holding's aim to grow as quickly as possible: "We remain committed to growing our business through aggressive organic growth and the strategic deployment of capital into accretive acquisitions that extend our brand into the most attractive U.S. markets."  The press release also contained the same statements about Curaleaf Holdings set out in previous press releases – that the Curaleaf brand was "a

premium mainstream cannabis brand" and the products met the "highest standards for safety, effectiveness, [and] quality."

63.     Indeed, Curaleaf Holdings continued to expand rapidly, despite the legal risks it had acknowledged in its listing statement, with press releases announcing new acquisitions and openings issued regularly in the days leading up to the start of the class period, and emphasizing the safety, effectiveness and quality of Curaleaf Holdings' products.  These include:

> (a)     A press release dated November 1, 2018 announcing Curaleaf had opened North Miami's first medical marijuana dispensary.
>
> (b)     A press release dated November 12, 2018 announcing Curaleaf Holdings had opened its 15th medical marijuana dispensary in Florida.
>
> (c)     A press release dated November 16, 2018 announcing Curaleaf Holdings had opened its 16th medical marijuana dispensary in Florida, and its first in Tallahassee.
>
> (d)     A press release dated November 20, 2018, announcing Curaleaf Holdings had opened its 17th medical marijuana dispensary in Florida.

64.     Curaleaf Holdings' rapid expansions and evident confidence in its future continuing success in the cannabis market encouraged investors to invest in Curaleaf Holdings securities.  For example, on November 7, 2018, Eight Capital initiated coverage on Curaleaf Holdings and gave it a "BUY" rating.  Despite briefly acknowledging uncertainties and risks posed by U.S. federal law to Curaleaf Holdings' business, Eight Capital's report focused heavily on Curaleaf Holdings' rapid and extensive expansion throughout the U.S in encouraging investors to purchase Curaleaf Holdings securities.

**E.    The Class Period Begins: Curaleaf Holdings Launches CBD Products and Continues to Expand**

65.    On November 21, 2018, Curaleaf Holdings issued a press release announcing that Curaleaf had launched "a line of premium hemp-based CBD products" including oil droplets, soft gel capsules and vape pens.  The products were described as "premium," meeting "the strictest quality standards" and "supporting overall wellness." The press release also emphasized that the CBD products were "natural" and underwent "strict laboratory testing."

66.    The CBD products were advertised and sold on Curaleaf Holdings' website. Information on the website about these CBD products included the following:

     (a)    The CBD Disposable Vape Pen was being sold "for chronic pain."

     (b)    The CBD tincture was sold as a "soothing tincture for chronic pain."

     (c)    That CBD oil was a treatment for anxiety, depression, PTSD and chronic pain.

     (d)    That CBD was an "effective treatment" for Parkinson's disease and Alzheimer's disease.

     (e)    That CBD can reduce opioid-related withdrawal and the buildup of tolerance.

     (f)    That CBD can counteract the growth and spread of cancer and kill breast cancer cells.

     (g)    That CBD can deter heart disease.

67.     Both the press release of November 21, 2018 announcing the launch of the CBD products and the Curaleaf website at this time, omitted to disclose that the CBD products were not FDA approved.

68.     The price of Curaleaf Holdings securities rose in response to the announcement.



69.     Also on November 21, 2018, Curaleaf issued a press release announcing Curaleaf had acquired a dispensary in Arizona, its 33rd dispensary in the U.S. The press release described Curaleaf's cannabis products as "premium" and meeting "the highest standard for safety, effectiveness, consistent quality", but did not disclose that the products were not FDA approved.

70.     On November 26, 2018, Curaleaf Holdings held an earnings call for its 2018 third quarter results.  At this call, Defendant Lusardi discussed the newly launched CBD product line:

> Most recently, we launched our CBD product line, Curaleaf Hemp, for our consumers who are looking to experience the benefits of CBD without the effects of THC. This product line is comprised of 15 SKUs including disposable vape pens, tinctures, topicals and capsules. The interstate regulations for CBD are vastly different than that of our THC products, which will give us the opportunity to offer these products through e-commerce, major third party retailers, pharmacy chains and grocery stores, in addition to vape shops and dispensaries. We are very enthusiastic about this opportunity and hope to announce a number of significant third-party distribution agreements in 2019.

71.     Defendant Lusardi also made clear the intention for Curaleaf Holdings to expand as quickly as possible: "The foundation of our expansion plan is grounded in creating the most significant cannabis retail and branded product company in the United States. We are currently opening approximately one new retail location per week and will be aggressively opening new stores through 2019 and beyond."  Later in the call, he stated that he expected the enactment of the 2018 Farm Bill "will certainly be a catalyst for more and more retailers and more and more outlets to take on [CBD]."

72.     In a press release dated November 26, 2018 announcing Curaleaf's Third Quarter 2018 Financial and Operational Results, Curaleaf Holdings again referred to its cannabis products meeting "the highest standard for safety, effectiveness, consistent quality" and also stated Curaleaf's "Florida operations" had received a "Safe Quality Food certification under the Global Food Safety Initiative." However, the press release omitted to disclose that Curaleaf Holdings' cannabis products were not FDA approved.

73.     Analysts continued to encourage investors to buy Curaleaf Holdings securities.  For example, on November 27, 2018, Eight Capital issued a report giving Curaleaf Holdings a "BUY" rating, again relying on Curaleaf Holding's past and expected expansion activities in the U.S.

74.    On November 28, 2018, Curaleaf Holdings issued a press release announcing its shares had been approved to trade on the OTC bulletin board. The press release again referred to Curaleaf's cannabis products as meeting "the highest standard for safety, effectiveness, consistent quality" and also stated Curaleaf's "Florida operations" had received a "Safe Quality Food certification under the Global Food Safety Initiative." However, the press release omitted to disclose that Curaleaf Holdings' cannabis products were not FDA approved.

75.    On November 29, 2018, Curaleaf Holdings filed its Management Discussion and Analysis for the nine months ending September 30, 2018 with the CSE (this document was also filed with the OTCQX on January 15, 2019).   The "risk factors" section of this document addressed only risks that applied prior to the business combination announced on October 26, 2018; it made no mention of risks posed by the cannabis regulatory regime. This was contrary to a staff notice issued by the Canadian Securities Administrators on February 8, 2018, which required Canadian corporations which undertook marijuana-related activities in the U.S. to disclose, in their filings, legal and regulatory risks faced by the corporation in the U.S.   The notice explicitly requires, *inter alia*, that such corporations disclose in their filings "that marijuana is illegal under U.S. federal law and that enforcement of relevant laws is a significant risk". These disclosures are required "so that investors can make informed investment decisions." (CSA Staff Notice 51-352 (Revised), *Issuers with U.S. Marijuana-Related Activities*).

76.    Subsequent press releases by Curaleaf Holdings dated December 4, 2018 (announcing the launch of the first medical marijuana dispensary in Ocala, Florida), December 5, 2018 (announcing the launch of a share buyback program) and December 14,  2018 (announcing Curaleaf's launch of a medical marijuana dispensary in Florida) again referred to its cannabis

products as "premium" and meeting "the highest standard for safety, effectiveness, consistent quality," but omitted to disclose the cannabis products were not FDA approved.

77.     As mentioned, the 2018 Farm Bill was enacted on December 20, 2018.   In the following months, Curaleaf Holdings continued to expand rapidly, including as follows:

(a)     On January 4, 2019, it issued a press release announcing the opening of its fourth dispensary in New York State, and its 36th dispensary in the U.S.

(b)     On January 7, 2019, it issued a press release announcing the opening of its 20th dispensary in Florida.

(c)     On January 9, 2019, it issued a press release announcing the opening of its 21st dispensary in Florida.

(d)     On January 10, 2019, it issued a press release announcing a series of agreements whereby it would expand its operations in Maryland.

(e)     On January 11, 2019, it issued a press release announcing one of its subsidiaries had been selected for a provisional medical cannabis processor license from the Ohio Department of Commerce. On the same date, it also issued a press release announcing Curaleaf would participate in the upcoming Benzinga Cannabis Capital Conference.

(f)     On January 18, 2019, it issued a press release announcing Curaleaf had joined the New Jersey Business & Industry Association.

(g)     On January 28, 2019, it issued a press release announcing it had expanded its executive leadership team.

35

(h)     On January 29, 2019, it issued a press release announcing Curaleaf would webcast live atVirtualInvestorConferences.com on January 30, 2019.

(i)     On February 19, 2019, it issued a press release announcing that that it had qualified to trade on the OTCQX Best Market, having upgraded from the Pink market.

(j)     On February 27, 2019, it issued a press release announcing it had agreed to acquire a California-based cultivation facility which was also developing three dispensaries across California.  It issued a press release announcing it had completed this acquisition on April 1, 2019.

(k)     On March 13, 2019, it issued a press release announcing that it would report its fourth quarter 2018 financial and operational results later that month.  On March 20, 2019, it issued a press release announcing these results.

(l)     On March 18, 2019, it issued a press release announcing that it had agreed to acquire an entity in Nevada which operated the state's largest cultivation facility, a production and extraction lab and a dispensary in Las Vegas.

(m)    On March 21, 2019, it issued two press releases: one announcing that it had opened its 23rd Florida dispensary, and 43rd dispensary in the U.S. and one announcing that it had opened a dispensary in Gainesville, Florida.

(n)     On March 28, 2018, it issued a press release announcing its involvement in an initiative to increase veterans' access to medical cannabis.

36

78.     In the press releases referred to above, Curaleaf Holdings referred, *inter alia*, to the safety, effectiveness and quality of its cannabis products. However, it did not disclose, in any of these press releases, that its cannabis products were not FDA approved.

79.     On March 20, 2019, Curaleaf Holdings held a conference call for its fourth quarter financial results. During the call, Executive Director Boris Jordan emphasized Curaleaf Holdings' focus on rapid growth:

> We have done exactly what we set out to do, which is build our presence in highly populated limited-license states through a vertically integrated strategy. This puts Curaleaf on the path to accelerated growth.
>
> We believe our unique investment attributes will deliver outside shareholder returns and we are pursuing growth in a differentiated way from every other operator in the industry. We believe we will remain the clear leader in this rapidly evolving industry based on the following strategy. First, we are not simply putting a flagpole up in states with licenses that will require huge amounts of capital build-out. We already have 42 dispensaries that are operational across 12 states, establishing us as a leader in the US. We are targeting over 70 dispensaries by year end.
>
> As a first mover, we have navigated the intricacies of the industry and gained the expertise to build out more dispensaries faster and more efficiently than anyone else.

80.     Mr. Johnson also acknowledged the quickly changing legal regime around cannabis in the U.S., referring to an "evolving landscape in the hemp industry", legal "conflict between the federal government and the states" and the expectation that "numerous pieces of legislation will be introduced over the next quarter."

81.     Defendants Lusardi and Davidson also emphasized Curaleaf Holdings' rapid expansion across several states in the U.S. Defendant Lusardi also announced, during the call, that by the end of the week, 800 CVS stores would stock "Curaleaf Hemp" products. Defendant Lusardi indicated further retail partnerships were expected, stating that "that is just one of the

many national retail partnerships that we hope to cement in 2019. We're having dialog with many of the leading retailers across the country."

82.     Analysts continued to be confident about Curaleaf Holdings' future success as a result of the information Curaleaf Holdings had provided to the market. For example, on April 12, 2019, Jesse Pytlak, an analyst with Cormark Securities Inc., considered his "top pick" to be Curaleaf Holdings because of its operations in various U.S. states, which "shows the company is able to scale and execute operationally on a multistate basis, which is a challenge in the U.S. given the inconsistent regulatory structures in each state. Several of the current medical markets are contemplating adult-use legalization, including New Jersey and New York, so you have some good optionality from that." (The Wall Street Transcript, "Curaleaf is Top Cannabis Stock Pick from Cormark Institutional Equity Research Analyst Jesse Pytlak" https://www.twst.com/news/curaleaf-top-cannabis-stock-pick-cormark-institutional-equity-research-analyst-jesse-pytlak/. Therefore, despite the legal and regulatory risks, Curaleaf Holdings' fast and extensive expansion encouraged the market to consider its securities were a good investment.

83.     On April 23, 2019, Curaleaf Holdings filed the Management's Discussion and Analysis of Financial Condition and Results of Operations for the Year Ended December 31, 2018 and 2017 with SEDAR This document was filed with the OTCQX on May 14, 2019 and the CSE on December 13, 2019.  For the first time since the release of its CBD product line on November 21, 2018 (almost five months previously), Curaleaf Holdings acknowledged possible risks to its products from the FDA regulatory regime:

> **Regulatory Action and Approvals from the Food and Drug Administration**

The Company's cannabis-based products are supplied to patients diagnosed with certain medical conditions. However, the Company's cannabis-based products are not approved by the FDA as "drugs" or for the diagnosis, cure, mitigation, treatment, or prevention of any disease. Accordingly, the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug and Cosmetic Act ("FDCA").

Cannabidiol, a compound referred to as CBD is one of the non-psychotropic cannabinoids in industrial hemp from the plant species Cannabis sativa L. There has been growing interest in CBD in recent years. CBD is increasingly used as an ingredient in food and beverages, as an ingredient in dietary supplements and as an ingredient in cosmetics, thereby generating new investments and creating employment in the cultivation and processing of hemp and hemp-derived products. Pharmaceutical products with CBD as an active ingredient have also been developed, including one product approved by the FDA (Epidiolex®). Foods and beverages, dietary supplements, pharmaceuticals, and cosmetics containing CBD are all subject to regulation under the FDCA. The FDA has asserted that CBD is not a lawful ingredient in foods and beverages, supplements and pharmaceuticals (unless FDA-approved), although FDA has generally refrained from taking enforcement action against those products. CBD-containing products may also be subject to the jurisdiction of state and local health authorities.

In recent years, the FDA has issued letters to a number of companies selling products that contain CBD oil derived from hemp warning them that the marketing of their products violates the FDCA. FDA enforcement action against the Company could result in a number of negative consequences, including fines, disgorgement of profits, recalls or seizures of products, or a partial or total suspension of the Company's production or distribution of its products. Any such event could have a material adverse effect on the Company's business, prospects, financial condition, and operating results.

On December 20, 2018, the Agricultural Improvement Act, H.R. 25 (the "Farm Bill"), which included the language of the Hemp Farming Act of

2018, removed industrial hemp and hemp-derived products with a tetrahydrocannabinol ("THC") concentration of not more than 0.3 percent (dry weight basis) from Schedule I of the Controlled Substances Act. This has the effect of legalizing the cultivation of industrial hemp for commercial purposes, including the production of CBD and other cannabinoids, except for THC, subject to regulations to be developed by the U.S. Department of Agriculture.

The Company sells and distributes certain products containing CBD. There is a risk that the FDA or state or local Departments of Health will seek to stop the Company from selling its CBD products or seek to have the claims made for those products revised.

84.     Although this document acknowledged potential regulatory risks in relation to Curaleaf Holdings' CBD products, it was only filed with SEDAR at this time.  This was despite that fact that Curaleaf Holdings' securities were being traded in the U.S. on the OTCQX. This document was not filed with the OTCQX until May 14, 2019.

85.     In addition, despite its acknowledgment of potential regulatory risks in relation to its CBD products, Curaleaf Holdings continued to market them on its website as it had before, including making various claims as to the medicinal properties and health benefits of its CBD products, without a disclaimer that the products were not FDA approved.

86.     Curaleaf Holdings also continued its expansion activities throughout the U.S., issuing frequent press releases which emphasized the quality of its cannabis products but failed to clarify that those products were not FDA approved.  These included:

>       (a)     On April 30, 2019, Curaleaf Holdings issued a press release announcing the opening of its 24th Florida dispensary.

      (b)     On May 1, 2019, Curaleaf Holdings issued a press release announcing that it had agreed to acquire the most well-known cannabis wholesale brand in the U.S.

      (c)     On May 2, 2019, it issued a press release announcing its involvement in increasing veterans' access to medical cannabis in Arizona.

      (d)     On May 6, 2019, Curaleaf Holdings issued a press release announcing it had agreed to an option to acquire an Ohio entity's medical cannabis cultivation and processing licenses and facility in Ohio.

87.     As before, analysts encouraged investment in Curaleaf Holdings, relying on Curaleaf's reports of its rapid expansion activities.  An *MJ Global Report* article dated May 1, 2019 linked Curaleaf Holdings' acquisitions of two other companies and its sale of CBD products through CVS drugstores to "favorable ratings from investment firms. Three analysts have so far recommended a buy rating on the stock."  The article also stated that "[s]hares of Curaleaf registering impressive gains comes on the heels of the company embarking on an aggressive acquisition drive in pursuit of growth in the cannabis sector" and  that "Curaleaf is an exciting cannabis play given the investment it has made in pursuit of market share in some of the biggest cannabis marketplaces. The company has also shown its readiness to spend big on acquisitions all in the effort of strengthening its prospects in the sector." (MJ Global Report, "Why Analysts Are Bullish About Curaleaf Holdings Inc. (OTCMKTS: CURLF)", https://mjglobalreport.com/why-analysts-bullish-curaleaf-holdings-inc-otcmktscurlf/).

88.     In addition, despite its own acknowledgment of regulatory risks posed by the FDA, on May 10, 2019, Curaleaf Holdings announced, in a press release, that it had launched Bido,

hemp-based CBD products for pets, in the forms of "pet drops" and "soft-baked bites." The products were stated to "support a pet's overall wellness including the potential to help manage pain and anxiety." The CBD pet products were advertised and sold on Curaleaf Holdings' website. Information on the website about these CBD products included the following:

 (a) That they decreased compulsive behavior and separation anxiety in dogs.

 (b) That the products were "natural and safe."

 (c) That they treated arthritis and joint issues in dogs.

 (d) That they treated osteoarthritis in dogs and may do so for cats.

 (e) That they can relieve cancer pain and may slow the growth of cancer in animals.

 89. The rapid expansion of Curaleaf Holdings' operations also continued.  As before, Curaleaf Holdings continued to issue press releases announcing its expansion and other activities, each of which emphasized the quality of its cannabis products but did not disclose that its products were not FDA approved.  In particular:

 (a) On May 10, 2019, Curaleaf Holdings issued a press release announcing Curaleaf's participation in the Canaccord Genuity Cannabis Conference.

 (b) On May 20, 2019, Curaleaf Holdings issued a press release announcing it would report its first quarter 2019 financial and operational results at the end of the month.

 (c) On May 21, 2019, Curaleaf Holdings issued a press release announcing the acquisition of its sixth dispensary in Arizona.

(d)     On May 28, 2019, Curaleaf Holdings issued a press release announcing its sponsorship of the University of Connecticut's industrial hemp research.

(e)     On May 30, 2019, Curaleaf Holdings issued a press release announcing it had completed the acquisition of a dispensary in Arizona.

(f)     Also on May 30, 2019, Curaleaf Holdings issued a press release announcing its first quarter 2019 financial and operational results.

(g)     On June 4, 2019, it issued a press release announcing it would be participating in five different institutional investor conferences in June 2019.

(h)     On June 27, 2019, Curaleaf Holdings issued a press release announcing it had agreed to acquire another cultivation and processing facility, and retail location, in Arizona.  It also announced it had agreed to acquire another dispensary in Arizona.

(i)     On July 10, 2019, Curaleaf Holdings issued a press release announcing two new executive appointments.  This included the appointment of a Senior Vice President of Compliance, whose role was to "oversee Curaleaf's ethics and compliance program and will work closely with the executive leadership team to ensure the company meets its requirements with all national and state-specific laws, regulations and industry codes throughout its operations."

(j)     On July 17, 2019, Curaleaf Holdings issued a press release announcing it had agreed to acquire GR Companies, Inc., "the largest private vertically-

integrated multistate operator" which "brings together the largest public and largest private multi-state operators in the U.S. to offer a full range of products to consumers in states across the country" and would pave the way for Curaleaf Holdings to enter the market in states it did not previously operate.

90.     Analysts continued to encourage investment in Curaleaf Holdings as a result of its rapid expansion and the apparent confidence it had in its future success.  On June 10, 2019, Compass Point Research and Trading, LLC. initiated coverage of Curaleaf Holdings, giving it a "Buy" rating.  While acknowledging the rapidly changing regulatory and legal regime governing cannabis in the U.S., Compass Point's report again relied heavily on Curaleaf Holdings' expansion throughout the U.S. – specifically noting that it was the "[l]argest retail dispensary chain in the U.S." -  in encouraging investors to purchase Curaleaf Holdings securities.

91.     In summary, during the class period, Curaleaf Holdings made numerous statements as to the quality, effectiveness, safety and health/medical benefits of its CBD products, continually reported on Curaleaf Holdings' rapid growth and expansion, and indicated an ambition to effectively take over the cannabis market in the U.S.  It simultaneously omitted to fully disclose, the fact its CBD products were not FDA approved, the lack of certainty around the cannabis regulatory regime, and the very real risk that Curaleaf Holdings could be subject to regulatory enforcement. In addition, Curaleaf Holdings lacked internal oversight of potential legal and regulatory risks, appointing an executive to oversee compliance matters very late in the class period, on July 20, 2019.

92.     In particular, Curaleaf Holdings was aware, as early as Defendant Lusardi's comments reported by the media on September 5, 2018 and  the Listing Statement filed with SEDAR on October 26, 2018, that the U.S. state and federal regimes posed risks to the cannabis industry and, therefore, Curaleaf Holdings' business.  Despite this, Curaleaf Holdings continued its rapid growth and expansion throughout the U.S.  It regularly issued press releases on its expansion activities.  And in each press release, it emphasized the quality, effectiveness and safety of its cannabis products – but omitted to ever mention, in its press releases, risks posed by the legal regime governing cannabis in the U.S.  This created the impression, for investors, that Curaleaf Holdings' cannabis products were of a high quality, safe, effective  and had the health/medical benefits Curaleaf Holdings advertised, without clarifying that the federal body responsible for overseeing the quality, safety and effectiveness of medical and food  products in the U.S. had not approved these products.

93.     Furthermore, any acknowledgment of legal risks to the cannabis industry in the Listing Statement filed with SEDAR on October 26, 2018 was inadequate to inform U.S. based investors of risks, because that Listing Statement was not filed on the OTCQX until January 15, 2019.   By that date, the U.S. regulatory regime had changed, notably through the passage of the 2018 Farm Act on December 20, 2018, and the FDA's announcement on that date that it continued to exercise the authority to approve cannabis food and medical products.

94.     In addition, Curaleaf Holdings neither addressed the change in the law which resulted from the passage of the 2018 Farm Act in December 2018 or the FDA's announcement on that date at the time these events occurred.  Instead, it continued to issue press releases advertising its expansion and the quality, effectiveness and health benefits of its cannabis products.  It also

continued to market its CBD products as medical and dietary products on its website, with no mention that these products were not FDA approved.  Again, this created the impression, for investors, that Curaleaf Holdings' cannabis products were of a high quality, safe, effective  and had the health/medical benefits Curaleaf Holdings advertised, without clarifying that the federal body responsible for overseeing the quality, safety and effectiveness of medical and food  products in the U.S. had not approved these products.

95.     It was not until the Management Discussion & Analysis filed with SEDAR on April 23, 2019, the CSE on December 13, 2019 and (in the U.S.) with the OTCQX on May 14, 2019, that Curaleaf Holdings mentioned the 2018 Farm Act and  U.S. cannabis regulatory regime at the time.  However, Curaleaf Holdings still continued, after this, to issue numerous press releases advertising its expansion and the quality, effectiveness and health benefits of its cannabis products. It also still continued to market its CBD products as medical and dietary products on its website, with no mention that these products were not FDA approved, including launching a line of CBD pet products in May 2019.  Again, all this created the impression, for investors, that Curaleaf Holdings' cannabis products were of a high quality, safe, effective  and had the health, medical and veterinary benefits Curaleaf Holdings advertised, without clarifying that the federal body responsible for overseeing the quality, safety and effectiveness of medical, veterinary and food products in the U.S. had not approved these products.

**F.      The Class Period Ends; The FDA Letter Discloses the Truth**

96.     On July 22, 2019, the FDA issued a warning letter to Curaleaf (as described above, Curaleaf is a subsidiary of Curaleaf Holdings) regarding several CBD products sold at http://curaleafhemp.com ("FDA Letter").  The letter stated that Curaleaf was selling unapproved

new and misbranded drugs, improperly marketing its CBD products as dietary supplements, and selling unapproved new animal drugs in violation of the Federal Food, Drug and Cosmetic Act. The letter is attached hereto as Exhibit A and disclosed, *inter alia*, the following:

a)  A number of Curaleaf's CBD products were unapproved new drugs and misbranded drugs sold in violation of the Federal Food, Drug and Cosmetic Act ("FD&C Act"). This was particularly because Curaleaf explicitly marketed these products on its website as to be used to treat various medical conditions.

b)  Curaleaf's CBD products for animals were unapproved new animal drugs sold in violation of the FD&C Act. This was particularly because Curaleaf explicitly marketed these products on its website as to be used to treat health issues in animals.

c)  Some of Curaleaf's CBD products were described on its website in a way that indicated Curaleaf intended to sell them as dietary supplements, but the FDA had determined that CBD products could not be sold as dietary supplements under the FD&C Act.

d)  That Curaleaf must promptly address these violations of the FD&C Act, and failure to do so could result in legal action by the FDA. Curaleaf was required to provide the FDA with information as to the steps it had taken to address these violations.

97.     Investors were shocked by the revelation and Curaleaf shares tumbled 8%
as a consequence of the FDA's warning letter, and continued to fall in the subsequent
days        as        the        market        fully        digested        the        news:



98.     The FDA letter also garnered significant attention from media commentators.  For
example, on July 23, 2019, CNN reported on the FDA Letter, particularly the fact it had pointed
out that Curaleaf had made "unsubstantiated health claims."   The article included comments by
Jonathan Miller, general counsel for industry-backed advocacy group U.S. hemp, that "It's so
important for the FDA to get a regulatory handle on this…There are bad products out there. There
are products that make false claims. It's important that FDA develop standards" and that "Our
biggest enemy isn't the FDA or the DEA, but CBD companies making false claims." ("FDA issues

48

warning        to        CBD        company        for        'unsubstantiated'        health        claims"
"https://edition.cnn.com/2019/07/23/health/cbd-curaleaf-fda-warning-letter-bn/index.html).

99.    Also on July 23, 2019, the *Boston Globe* reported on the FDA letter. The article
highlighted Curaleaf's unsubstantiated claims that CBD could treat illnesses like cancer and the
FDA's concerns of harm to patients from CBD products marketed in this way, reporting that the
"FDA blasted Curaleaf's claims that its CBD products can treat chronic pain, eating disorders,
anxiety, attention deficit hyperactivity disorder, Alzheimer's disease, Parkinson's disease,
depression, post-traumatic stress disorder, schizophrenia, and addiction."  The article quoted David
Gortler, a former FDA official and pharmacologist, who stated "[t]he jury is still out on this drug"
and that the FDA protected people from "snake oil salesmen."   The article also reported that
"[m]any CBD companies say they welcome regulations to support the bad actors from the good."
("FDA      warns      Curaleaf      to      stop      marketing      CBD      with      unfounded      claims"
https://www.bostonglobe.com/news/marijuana/2019/07/23/fda-warns-curaleaf-stop-marketing-
cbd-with-unfounded-claims-about-treating-cancer-alzheimer-pet-
anxiety/wiJ3zcXK4zDB84hCjk5v3I/story.html).

100.    On July 24, 2019, *MarketWatch* reported that "shares of cannabis company
Curaleaf Holdings Inc. tumbled more than 7% Tuesday and dragged the broader sector lower, after
the U.S. Food and Drug Administration sent a warning letter to the company for selling CBD-
based products that claim to treat serious diseases."  The article quoted sections of the FDA letter
which stated that Curaleaf was illegally marketing its CBD products, and  also reported that
"Andrew Kessner, analyst at William O'Neil & Co., said it was not surprising that the first major
action was against Curaleaf" given Curaleaf had "made the largest push into CBD."  ("Curaleaf

49

shares tumble 8% after FDA sends warning letter over CBD health claims"
https://www.marketwatch.com/story/curaleaf-shares-tumble-8-after-fda-warning-letter-over-cbd-health-claims-2019-07-23).

101.    On the same day, *Bloomberg* reported that "[t]he most valuable marijuana company in the U.S. is under fire for how it's marketing and selling CBD" and that Curaleaf Holdings' "share price plunged more than 14% on Tuesday, before paring the losses. Shares were down about 5.6% as of 2:22 p.m. in New York". (FDA Targets U.S. Marijuana Leader in CBD Marketing Crackdown" https://www.bloomberg.com/news/articles/2019-07-23/fda-targets-u-s-marijuana-leader-in-crackdown-on-cbd-marketing).

102.    On July 23, 2019, Curaleaf Holdings issued a press release containing a statement in response to the FDA Letter:

> Curaleaf is committed to the highest standards of quality and compliance, and will work collaboratively with the FDA to resolve all issues addressed in the agency's letter. The Company will respond to the FDA letter within the required 15 working days. Compliance is a top priority for Curaleaf and the Company is fully committed to complying with FDA requirements for all of the products that it markets. We can affirm that nothing in the letter raises any issues concerning the quality and consistency of any Curaleaf product or calls into question the high safety standards of the Company's cultivation and manufacturing processes. Curaleaf CBD products are all derived from hemp and meet the requirements of the Farm Bill.

103.    Unsurprisingly, this brief and generalized statement failed to reassure investors in light of the detailed and specific concerns raised in the FDA Letter.  In particular, while Curaleaf Holdings' statement attempted to reassure the public and investors that the FDA Letter did not call into question the quality and safety of its CBD products, the *very fact* that its CBD products were

50

not FDA approved called into question their quality and safety. This was especially so given the fact those products were marketed as drugs and dietary supplements contrary to federal law. Similarly, the statement that Curaleaf Holdings' CBD products met the requirements of the 2018 Farm Bill was ambiguous.  While the 2018 Farm Bill did remove hemp from Schedule 1 of the Controlled Substances Act, it explicitly retained the FDA's authority to regulate drugs, cosmetics and food products, and Curaleaf Holdings' CBD products were not FDA approved.

104.   As a result of the FDA Letter, Curaleaf Holdings shares fell $0.58 per share, or 7.27% to close at $7.40 per share on July 23, 2019, damaging investors.

### G.   Curaleaf Holdings' Subsequent Conduct

105.   On July 26, 2019 Curaleaf issued a press release reporting that it had responded to the FDA and that it had removed the statements highlighted in the FDA Letter.  It also stated that many of the products referred to in the FDA Letter had been discontinued.  Curaleaf, and Curaleaf Holdings, have never denied their conduct was illegal under the Federal Food, Drug and Cosmetic Act.

106.   On August 27, 2019, Curaleaf Holdings held its earnings call for the second quarter of 2019.  During the call, in response to questions about the FDA Letter, Defendant Davidson stated:

> This market I mean in the 30 years that I've built many-many billion dollar companies, moving fast and getting market share on a new industry is very-very important. And you will have missteps along the way. That's just part of doing that.
>
> And **the successful companies in fact, are companies that do take risks. Those that don't take risk never make it to the finish line. Those that do take risk make it.** Now we have appointed recently a new head of

compliance within the company, some of it comes out from one of the biggest – bigger compliance operations in the country and a big corporate, in order to beef up our internal compliance.

However, I will tell you that if you look at both of our situations because we've always taken compliance seriously, if you look at both the Massachusetts situation and the FDA situation, in both of these **situations there was a tremendous amount of ambiguity and lack of transparency from the regulators about what the rules are**…[W]ith the FDA who has gotten a law passed bill where the Congress passed the law in December and the FDA has come out and not really guided to what they are – you are allowed to do and what you're not allowed to do in the CBD market…

So, I just want you to know that in both of the situations in the FDA and in Massachusetts there was **a tremendous amount of lack of transparency or rules by these regulatory agencies, because it is a new industry**. And I'm not it pointing my finger at either the FDA or Massachusetts, these are new industries moving at a very fast pace, so they haven't even written the rules.

(Emphasis added).

## V.    SCIENTER ALLEGATIONS AND LOSS CAUSATION

107.    Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged above were materially false and misleading: (ii) such statements and omissions would deceive investors into purchasing Curaleaf Holdings securities at artificially inflated prices.

108.    See the attached Exhibit B for a complete recitation of the relevant speaker, the document, the particular false or misleading statement or omission, and the reasons why the statements were false and misleading or omitted to state material facts necessary to make the statements accurate and complete.

109.   In particular, the cannabis regulatory regime in the U.S. was – and is – clearly complex at the time Curaleaf Holdings launched its CBD product line.  State laws on cannabis regulation vary widely.  As discussed above, some states allow marijuana sale, possession and/or use for medical purposes and some also allow marijuana sale, possession and/or use for recreational purposes.  Possession and use limits vary from state to state.  Whether state marijuana laws include hemp (and CBD) also varies from state to state.  In addition, many state laws have only been enacted within the last few years, meaning the regulatory landscape is fast changing and in many instances state laws may not have been in effect long enough for their meaning and effect to have been fully clarified.

110.   On the federal level, cannabis regulation is – and was, during the Class Period – similarly complex. The 2018 Farm Act is very new legislation.  The Cole and Sessions Memoranda give discretion to federal prosecutors rather than set out clear, unequivocal rules. And although the FDA's ability to regulate cannabis products is retained by the 2018 Farm Bill and made explicit in detailed information on the FDA website, the FDA has acknowledged it needs further information about cannabis products, holding a public hearing on the subject on May 31, 2019.

111.   In addition, the regulatory landscape changed during the period Curaleaf Holdings sold the CBD products referred to in the FDA Letter. When Curaleaf Holdings was formed, pursuant to the business combination completed on October 26, 2018, hemp (which was contained in the definition of marijuana) was still contained in Schedule 1 of the CSA.   The Cole Memorandum, which made prosecution for federal marijuana offenses discretionary where it would not achieve certain aims, was still in effect.  This was also the case, as of November 21, 2018, when Curaleaf Holdings launched its CBD products.

112.    Then, on December 20, 2018 – almost a month after Curaleaf Holdings launched its CBD products - the Farm Bill was enacted, removing hemp from the definition of marijuana in the CSA but retaining the FDA's authority to regulate drugs, dietary supplements and cosmetics containing hemp or hemp derived products (like CBD).  The federal regulatory regime therefore changed significantly during the Class Period.

113.    In fact, Defendant Davidson acknowledged the complexity of the cannabis regulatory regime in the U.S. during the earnings call on August 27, 2019, commenting on "a tremendous amount of lack of transparency or rules by these regulatory agencies [including the FDA], because it is a new industry."

114.    Despite Defendant Davidson effectively acknowledging that Curaleaf Holdings was potentially ignorant about regulatory compliance, Curaleaf Holdings went ahead with the launch of its human and animal CBD products, without adequately disclosing possible risks from regulatory action to its investors. In light of the complex cannabis regulatory regime in the U.S. and Defendants' confusion about it, Defendants should have exercised caution in proceeding, taken further steps to warn investors of risks and/or researched further what the regulatory regime required.

115.    Although Curaleaf Holdings did disclose potential legal issues arising from cannabis regulation in the U.S. in its Listing Statement dated October 26, 2018, this was inadequate to absolve Defendants of liability because it was (i) prior to the launch of its CBD products (and accordingly did not address risks specific to its CBD products from FDA enforcement); (ii) prior to the new regulatory regime created by the enactment of the 2018 Farm Act;  (iii) not published by the OTCQX (and therefore disclosed to U.S. based investors) until January 15, 2019 and; (iv) prior

to Curaleaf Holdings listing securities on the OCTQX.   In addition, the content of this listing statement was undercut by Curaleaf Holdings' continued advertisement in press releases of its cannabis products as safe, effective and of a high quality, its launch of its CBD products for humans in November 2018, which were marketed as beneficial for health and as dietary supplements, and its continued marketing of those CBD products as beneficial for health and suitable for consumption as dietary supplements – all without mention  that Curaleaf Holdings' CBD products were not FDA approved.

116.   Curaleaf Holdings only mentioned legal and regulatory risks associated with its CBD products in the Management Discussion and Analysis dated April 23, 2019. This was simply too late and too generalized – it came almost five months after the launch of Curaleaf Holdings' CBD product line for humans.   In addition, it was undercut by Curaleaf Holdings' continued advertisement in press releases of its cannabis products as safe, effective and of a high quality, continued advertisement of its CBD products as beneficial for health and as dietary supplements, and by its launch of animal CBD products in May 2019, which were similarly marketed as having health benefits - all without mention that Curaleaf Holdings' CBD products were not FDA approved.

117.   In addition, Curaleaf Holdings apparently paid little attention to regulatory compliance.  In the earnings call on August 27, 2019, Defendant Davidson referred to appointing a "new head of compliance."   Prior to August 2019, Curaleaf Holdings did not have a head of compliance, despite its acknowledged confusion about the cannabis regulatory regime.

118.   Further, regardless of Curaleaf Holdings' confusion as to exactly what was required by the cannabis regulatory regime, it was on notice of the risks it faced.  When the Class Period

begun, hemp was still covered by Schedule 1 of the Controlled Substances Act.  And upon passage of the 2018 Farm Bill, the FDA issued a statement confirming its continued role in regulating CBD products.

119.    Indeed, Curaleaf Holdings was simply so focused on expansion within the U.S., at all costs, that Defendants knowingly and/or recklessly failed to disclose important information about regulatory risks to investors. Defendants' prioritization of expansion over disclosure is apparent from the rapid pace at which Curaleaf Holdings expanded operations, as set out above.  In short, the transformation from Lead, a Canadian mining company which presumably had little experience with cannabis or the cannabis industry in the U.S., and PalliaTech, a smaller, private corporation, into Curaleaf Holdings happened relatively quickly, over the course of some eight months.  Even more rapid was Curaleaf Holdings' near continuous acquisition of cultivation sites and dispensaries in the U.S. from November 1, 2018 onward.

120.    This attitude of expansion at all costs – including at the cost of investors – is apparent from the comments of Defendant Lusardi, who, on October 29, 2018 spoke of Curaleaf Holdings expanding "through aggressive organic growth."   Similarly, on November 26, 2018, Defendant Lusardi stated "[w]e are currently opening approximately one new retail location per week and will be aggressively opening new stores through 2019 and beyond."  Finally, Defendant Davidson admitted Curaleaf Holdings had taken regulatory risks with its CBD products in order to prioritize expansion in the earnings call on August 27, 2019, when he stated "the successful companies in fact, are companies that do take risks. Those that don't take risk never make it to the finish line. Those that do take risk make it."

56

121.    In short, Defendants knowingly and/or recklessly omitted to disclose regulatory risks to investors, rendering their repeated statements about the quality, safety and health benefits of CBD – and specific statements about the medical properties of its CBD products – false and misleading.  Defendants' omissions and false and misleading statements artificially inflated the Curaleaf Holdings' stock price,  and operated as a fraud or deceit on acquirers of its securities.

122.    As detailed above,  when the truth about Curaleaf Holdings' omissions and false and misleading statements was revealed by the FDA Letter, the value of its shares declined, as the prior artificial  inflation no longer propped up its stock price. The decline in value of Curaleaf Holdings' shares was a  direct result of the nature and extent of Defendants' omissions and false and misleading statements.

123.    At all relevant times, Defendants' false and misleading statements and  omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiff and  other Class members.

## VI.    <u>NO SAFE HARBOR</u>

124.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein.  None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made.  Rather, the false and misleading statements alleged herein all relate to facts and conditions which existed in the past or existed at the time the statements were made. Moreover, cautionary statements, if any, did not identify the important factors that could cause actual results to differ materially from those in any forward-looking statements.

125.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by Individual Defendants, who actually knew or recklessly regarded the fact that each such statement was false and/or misleading when made.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

126.    At all relevant times, the market for Curaleaf Holdings Securities was an efficient market  for the following reasons, among others:

>   a.  Curaleaf Securities met the requirements for listing, and were listed and traded on the CSE and OTCQX, highly efficient markets;
>
>   b.  As a regulated issuer, Curaleaf Holdings filed periodic public reports during the Class Period with the CSE, SEDAR and OTCQX; and
>
>   c.  Curaleaf Holdings regularly communicated with public investors via established market communication mechanisms.

127.    As a result of the foregoing, the market for Curaleaf Holdings securities promptly digested current information regarding Curaleaf Holdings from all publicly available sources and reflected such information in Curaleaf Holdings stock price. Under these

circumstances, all purchasers of Curaleaf Holdings securities during the Class Period suffered similar injury through their purchase of Curaleaf Holdings securities at artificially inflated prices and a presumption of reliance applies.

128.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered risk of adverse legal and/or regulatory action when deciding whether to purchase and/or sell Curaleaf Holdings' stock.

## VIII.    CLASS ACTION ALLEGATIONS

129.    Lead Plaintiff brings this action on behalf of all individuals and entities that purchased or otherwise acquired Curaleaf Securities on the OTCQX during the Class Period, and were damaged (the "Class"). Excluded from the Class are Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

130.    Curaleaf Holdings had millions of shares outstanding as of November 21, 2018. Therefore, members of the Class are so numerous that joined of all members is impracticable. Throughout the Class Period, Curaleaf Holdings' stock was traded on the CSE and, from February 2019, the OTCQX. While the exact number of Class members is unknown to Lead Plaintiff

at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

131.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal securities laws complained of herein.

132.    Record owners and other members of the Class may be identified from records maintained by Curaleaf Holdings or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

a.      whether Defendants violated the federal securities laws by the Defendants' respective acts as alleged herein;

b.      whether the Defendants acted knowingly and/or with deliberate recklessness in making false and misleading statements about their CBD products and omitting to adequately disclose regulatory risks;

c.      whether the price of Curaleaf Holdings' stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

d.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60

133.     Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

134.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the other members of the Class.

135.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the  damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

## IX.     CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

136.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully  set forth herein.

137.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and  other members of the Class to purchase Curaleaf Holdings securities at artificially inflated prices. In  furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the  actions set forth herein.

138.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Curaleaf Holdings' securities in an effort to maintain artificially high market prices for Curaleaf Holdings' securities in violation of Section 10(b) of the Exchange  Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants  in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

139.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information, namely the risk of adverse regulatory action, about the business,  operations and future prospects of Curaleaf Holdings as specified herein.

140.    These Defendants engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Curaleaf Holdings' value and performance  and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Curaleaf Holdings and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly  herein, and engaged in transactions, practices and a course of business that operated as a fraud and  deceit upon the purchasers of Curaleaf Holdings' common stock during the Class Period.

141.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operations; (3) each Individual Defendant  enjoyed significant personal contact and familiarity with the other Individual Defendant and was  advised of and had access to other members of the Company's management team, internal reports  and other data and information about the Company's operations at all relevant  times; and (4) each Individual Defendant was aware of the Company's dissemination of  information to the investing public which they knew or recklessly disregarded was materially false  and misleading.

142.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing regulatory risks faced by Curaleaf Holdings from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendant Davidson's admission that Curaleaf Holdings considered the cannabis regulatory regime lacked transparency, if Defendants did not have actual knowledge of the  misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by  deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

143.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Curaleaf Holdings' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Curaleaf Holdings' publicly-traded stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Curaleaf Holdings' common stock during the Class Period at artificially high prices and were or will be damaged thereby.

144.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truths regarding the regulatory risks faced by Curaleaf Holdings, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Curaleaf Holdings securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

145.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

146.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

147.     This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II

### The Individual Defendants Violated Section 20(a) of the Exchange Act

148.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

149.     The Individual Defendants acted as controlling persons of Curaleaf Holdings within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the CSE, SEDAR, the OTCQX and in press releases posted on https://ir.curaleaf.com/press-releases,and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading and the decision not to disclose regulatory risks faced by the Company. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

150.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular statements and omissions giving rise to the securities violations as alleged  herein, and exercised the same.

151.    As set forth above, Curaleaf Holdings, and the Individual Defendants each violated Section 10(b),  and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

152.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in  connection with their purchases of the Company's common stock during the Class Period.

153.    This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount  to be proven at trial, including interest thereon;

c.       Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorney's fees and expert fees;

d.       Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e.       Such other and further relief as the Court may deem just and proper.

## XI.   **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a jury trial.

Dated: January 6, 2019

**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**

__/s/ Matthew M. Guiney_____
Matthew M. Guiney (MG5858)
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Guiney@whafh.com

*Counsel for the Lead Plaintiff and the Class*

-and-

**LEVI & KORSINSKY, LLP**

Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
nporritt@zlk.com
aapton@zlk.com

*Counsel for W. Frank Klun and Laura Klun
and Additional Counsel for the Class*