# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

In re CURALEAF HOLDINGS, INC.
SECURITIES LITIGATION

Case No. 1:19-cv-04486-BMC

**ORAL ARGUMENT REQUESTED**

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED <u>CLASS ACTION COMPLAINT</u>

Stephen L. Ascher
Andrew J. Lichtman
Jeremy H. Ershow
Allison N. Douglis
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com
jershow@jenner.com
adouglis@jenner.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

    A.    The Market's Awareness of Cannabis Regulation....................................2

    B.    The Company's October 2018 Disclosure of the Risks of FDA Regulation ...........3

    C.    The Company's November 2018 Disclosures ........................................5

    D.    The FDA's December 2018 Warning .....................................................6

    E.    The Company's January 2019 Disclosure ..............................................7

    F.    The FDA's April and May 2019 Warnings ............................................7

    G.    The Company's April and May 2019 Risk Disclosures .........................8

    H.    The Company's Press Releases and the FDA's Warning Letter ............9

    I.    The Amended Complaint ......................................................................10

LEGAL STANDARDS .........................................................................................................12

ARGUMENT .........................................................................................................................13

I.    The Amended Complaint Does Not State a Claim for Securities Fraud. .........13

    A.    The Amended Complaint Does Not Adequately Allege Any False or Misleading Misrepresentation or Omission. ......................................13

        1.    The Company Disclosed the Information It Allegedly Omitted............13

        2.    The Allegedly Omitted Information Was in the Public Domain. .............17

        3.    The Company's Promotional Statements Would Not Be Actionable Even in the Absence of Disclosures..........................................19

    B.    The Amended Complaint Does Not Adequately Allege Scienter. .......20

II.    The Amended Complaint Does Not Adequately Allege Domestic Transactions.............23

III.    The Amended Complaint Does Not Adequately Allege Control Person Liability............24

IV.    Granting Leave To Amend Would Be Futile...................................................25

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)...................................................................................24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...........................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................12

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)...........................................................18, 19

*Beleson v. Schwartz*,
    419 F. App'x 38 (2d Cir. 2011) .........................................................................15

*Carpenter's Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...............................................................................24

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ..........................................................20, 25

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000)..................................................................................25

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................................13

*Emerson v. Mut. Fund Series Tr.*,
    393 F. Supp. 3d 220 (E.D.N.Y. 2019) ...............................................................14

*Gaines v. Guidant Corp.*,
    No. 1:03CV00892-SEB-WTL, 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) .........20

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)................................................................22

*Gregory v. ProNAi Therapeutics, Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................19

*Holmes v. Grubman*,
    568 F.3d 329 (2d Cir. 2009)...............................................................................25

*In re Andrx Corp.*,
    296 F. Supp. 2d 1356 (S.D. Fla. 2003) .............................................................18

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)............................................................17, 18

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010).................................................................16

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014).................................................................15

*In re Egalet Corp. Sec. Litig.*,
   340 F. Supp. 3d 479 (E.D. Pa. 2018)................................................................22

*In re: Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. 2015) ......................................................................18

*In re GLG Life Tech Corp. Sec. Litig.*,
   No. 11 Civ. 9150 (KBF), 2014 WL 464762 (S.D.N.Y. Feb. 3, 2014)...................23

*In re Investment Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.NY. 2017)................................................................19

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)............................................................................23

*In re Petrobras Sec. Litig.*,
   150 F. Supp. 3d 337 (S.D.N.Y. 2015)...............................................................24

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ......................................................................24

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011).............................................................19, 20

*Jackson v. Wells Fargo Home Mort.*,
   No. 15-CV-5062 (PKC) (ST), 2018 WL 8369422 (E.D.N.Y. Aug. 10, 2018).......................25

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001).............................................................................22

*N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*,
   709 F.3d 109 (2d Cir. 2013).............................................................................18

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).............................................................................21

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................16

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
  573 F.3d 98 (2d Cir. 2009) ...................................................................................21

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.,*
  412 F.3d 103 (2d Cir. 2005) ..................................................................................17

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC,*
  771 F. App'x 494 (2d Cir. 2019) ...........................................................................20

*Stoyas v. Toshiba Corp.,*
  896 F.3d 933 (9th Cir. 2018) ................................................................................24

*Stratte-McClure v. Morgan Stanley,*
  776 F.3d 94 (2d Cir. 2015)................................................................................21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007).........................................................................................12, 21

*United States v. Georgiou,*
  777 F.3d 125 (3d Cir. 2015)...................................................................................24

**STATUTES**

15 U.S.C. § 78u-4(b)(2)(A)............................................................................................20

**OTHER AUTHORITIES**

*Filings and Disclosure*, OTC Markets, https://www.otcmarkets.com/stock/CURLF/disclosure
  (last visited Mar. 6, 2020) ......................................................................................9

*Information for Pink Companies*, OTC Mkts.,
  https://www.otcmarkets.com/corporate-services/information-for-pink-companies (last visited
  Mar. 6, 2020)..........................................................................................................7

*Curaleaf Holdings, Inc. (formerly Lead Ventures Inc.)*, SEDAR,
  https://www.sedar.com/DisplayProfile.do?lang=EN&issuerType=03&issuerNo=00037057
  (last visited Mar. 6, 2020) ...................................................................................3, 9

Defendants Curaleaf Holdings, Inc., Curaleaf, Inc.,[1] and Curaleaf Holdings' CEO Joseph Lusardi, former CFO and current COO Neil Davidson, and former EVP Jonathan Faucher (collectively, the "Individual Defendants" and, together with Curaleaf Holdings and Curaleaf, "Defendants") submit this Memorandum of Law in support of their motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

This is a particularly weak securities fraud case. All of Curaleaf's securities filings disclosed, almost word-for-word, the precise risk it is accused of omitting.

The Amended Complaint ("AC") accuses the Company of "fail[ing] to disclose to investors that CBD [cannabidiol] was ***not approved*** by the U.S. Food and Drug Administration and subject to regulatory rules that . . . were unclear as to exactly what cannabis products could be sold and how they could be marketed." AC ¶ 2 (emphasis in original). In fact, in the Listing Statement for its public offering on the Canadian Securities Exchange ("CSE"), the Company disclosed that its "cannabis-based products are not approved by the Food and Drug Administration ('**FDA**') as 'drugs' or for the diagnosis, cure, mitigation, treatment, or prevention of any disease. Accordingly, the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug and Cosmetic Act ('**FDCA**')." Ex. A, at 85.[2] Based on this disclosure, the Company went on to disclose the precise risk that it would be subject to "FDA enforcement action." *Id.* at 85–86. After originally making this disclosure in October 2018, the Company reiterated or referred to it in four more securities filings during the relevant period.

---

[1] Except where necessary to distinguish between them, this brief refers to Curaleaf Holdings, Inc., and Curaleaf, Inc., as "Curaleaf" or "the Company."

[2] Unless otherwise noted, all exhibits are appended to the Declaration of Stephen Ascher.

Plaintiffs try to avoid these on-point disclosures by listing virtually every press release issued by the Company, apparently to suggest that the Company was required to repeat this particular risk every time it communicated with the market. But that is not the law. The Listing Statement was the key disclosure document filed in connection with the Company's going-public transaction, and the Company reiterated that document's disclosures when it began trading on the OTCTX in January 2019 and yet again in April 2019. Curaleaf obviously was not required to include the same disclosures again and again, in every press release.

On top of these detailed disclosures of the exact risk the Company is accused of omitting, the Listing Statement extensively disclosed the general risk to the Company posed by the fact that cannabis is illegal under federal law. *Id.* at (i)–(ii). And of course, these risks were well-understood by the investing public as a result of copious information in the public domain, including the FDA's own repeated pronouncements concerning potential regulation.

The Company's disclosures also negate scienter. The Company plainly was not reckless in believing that it was enough to disclose the risk of FDA enforcement action on a regular basis in its securities filings. The Amended Complaint even disproves its own scienter allegations by suggesting that Defendants simply underestimated the regulatory risk—a level of culpability that is not sufficient to allege scienter. The Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A. The Market's Awareness of Cannabis Regulation

It is, of course, common knowledge that cannabis is subject to extensive federal regulation, including, at present, outright criminal prohibition. The Amended Complaint itself describes the recent history of federal prohibition and regulation of cannabis and cannabis-derived products. *See* AC ¶ 35 (describing a Drug Enforcement Administration rule intended to "more effectively track quantities of marijuana extract"); *id.* ¶ 36 (describing how the January 2018 "Sessions

Memorandum" expanded the framework under which federal prosecutors could charge marijuana offenses). While hemp has been removed from Schedule I of the Controlled Substances Act, *see infra* page 6, marijuana remains illegal under federal drug law, and investors in the cannabis industry know that they are entering an area of significant regulation.

In addition, the FDA has continually emphasized its intent to regulate cannabis-derived products under the FDCA. In June 2018, the agency publicly announced that it had approved a CBD-based drug to treat epilepsy. It stated that while it would "continue to support rigorous scientific research on the potential medical uses of marijuana-derived products," it was also "prepared to take action when [it saw] the illegal marketing of CBD-containing products with serious, unproven medical claims." *See* Ex. B. Thus, no reasonable investor could have been unaware of the risk of federal regulation—even before Curaleaf made its own disclosures.

**B. The Company's October 2018 Disclosure of the Risks of FDA Regulation**

Against this backdrop of publicly available information, the Company specifically disclosed the risk in question here. Curaleaf Holdings was created in a "reverse takeover" between the Canadian company Lead Ventures, Inc. (renamed "Curaleaf Holdings, Inc."), and the Delaware corporation PalliaTech, Inc. (renamed "Curaleaf, Inc."). AC ¶¶ 47, 53. The same day that the Company announced the completion of the business combination, it filed its Listing Statement with the System for Electronic Document Analysis and Retrieval ("SEDAR"). Ex. A; AC ¶ 58. Like all SEDAR filings, this document was readily available online to U.S. investors.[3]

---

[3] *See Curaleaf Holdings, Inc. (Formerly Lead Ventures Inc.)*, SEDAR, https://www.sedar.com/ DisplayProfile.do?lang=EN&issuerType=03&issuerNo=00037057 (last visited Mar. 6, 2020).

The Listing Statement offered extensive disclosures about the nature of—and risks associated with—the Company's United States cannabis business. *First*, the first two pages of the Listing Statement warned about the U.S. cannabis industry in bold, boxed text, including that:

> The United States federal government regulates drugs through the Controlled Substances Act (21 U.S.C. § 811), which places controlled substances, including cannabis, in a schedule. Cannabis is classified as a Schedule I drug. Under United States federal law, a Schedule I drug or substance has a high potential for abuse, no accepted medical use in the United States, and a lack of accepted safety for the use of the drug under medical supervision. The United States Food and Drug Administration has not approved marijuana as a safe and effective drug for any indication.

> In the United States marijuana is largely regulated at the state level. State laws regulating cannabis are in direct conflict with the federal Controlled Substances Act, which makes cannabis use and possession federally illegal. Although certain states authorize medical or adult-use cannabis production and distribution by licensed or registered entities, under U.S. federal law, the possession, use, cultivation, and transfer of cannabis and any related drug paraphernalia is illegal and any such acts are criminal acts under federal law. The Supremacy Clause of the United States Constitution establishes that the United States Constitution and federal laws made pursuant to it are paramount and in case of conflict between federal and state law, the federal law shall apply.

Ex. A, at (i).

*Second*, a section describing "General Development of the Business" emphasized—in bold—that "[a]lthough Curaleaf's activities are compliant with applicable United States State and local law, strict compliance with State and local laws with respect to cannabis may neither absolve Curaleaf of liability under United States federal law, nor may it provide a defense to any federal proceeding which may be brought against Curaleaf." *Id.* at 20.

*Third*, in a section entitled "Risk Factors," the Listing Statement specifically noted the potential for FDA regulation, including the precise risks the Company is accused of omitting:

> The Resulting Issuer's cannabis-based products are supplied to patients diagnosed with certain medical conditions. However, the

Resulting Issuer's cannabis-based products are not approved by the Food and Drug Administration ("**FDA**") as "drugs" or for the diagnosis, cure, mitigation, treatment, or prevention of any disease. Accordingly, the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug and Cosmetic Act ("**FDCA**").

In recent years, the FDA has issued letters to a number of companies selling products that contain CBD oil derived from hemp warning them that the marketing of their products violates the FDCA. FDA enforcement action against the Resulting Issuer could result in a number of negative consequences, including fines, disgorgement of profits, recalls or seizures of products, or a partial or total suspension of the Resulting Issuer's production or distribution of its products. Any such event could have a material adverse effect on the Resulting Issuer's business, prospects, financial condition, and operating results.

*Id.* at 85–86.

The Listing Statement therefore made clear that the FDA could view the Company's products as unapproved drugs and regulate them as such; that the FDA had already sent warning letters to companies selling CBD products; and that FDA enforcement could have serious adverse consequences to the Company.

### C. The Company's November 2018 Disclosures

Just a week later, the Company released its financial and operation reports for 2018's third quarter, including a Management Discussion and Analysis on SEDAR on November 29, 2018 (the "November 2018 MD&A"). This document was "in respect of the nine months ended September 30, 2018." Ex. C, at 1. Therefore, it "summarize[d] the principal risk factors that appl[ied] to the Company's business prior to the completion of the Business Combination," and exclusively addressed risks within the mining industry. *Id.* at 8; *see supra* page 3.

Importantly, the November 2018 MD&A stated: "For details of the risks and uncertainties relating to the Company subsequent to completion of the Business Combination, please refer to the Company's Listing Statement, dated October 26, 2018, which is available under the

Company's SEDAR profile." *Id.* Thus, in this securities filing, the Company again directed investors to the Listing Statement's disclosures quoted above.

**D.     The FDA's December 2018 Warning**

In December 2018, the Agriculture Improvement Act of 2018, also known as the "Farm Bill," was signed into law, removing hemp from Schedule I of the Controlled Substances Act and providing for hemp to be grown legally through various avenues. *See* AC ¶ 37. The Farm Bill therefore removed some regulatory uncertainty surrounding the Curaleaf Hemp product line by lessening the likelihood of DEA and Department of Justice regulation of its CBD products.

But in response to the new law, the FDA made clear that nothing had changed about its approach to regulating cannabis-derived products. In a public statement issued on December 20, 2018, the FDA noted that it "treat[s] products containing cannabis or cannabis-derived compounds as [it does] any other FDA-regulated products—meaning they're subject to the same authorities and requirements as FDA-regulated products containing any other substance." Ex. D; AC ¶ 39. Even more specifically, it noted that it "continue[d] to be concerned at the number of drug claims" involving CBD products, because "the FDA requires a cannabis product . . . that is marketed with a claim or therapeutic benefit, or with any other disease claim, to be approved by the FDA for its intended use before it may be introduced into interstate commerce"—"the same standard to which [the FDA holds] any product marketed as a drug for human or animal use." Ex. D. The statement described in detail the regulations affecting the marketing of CBD, and noted past FDA warning letters to companies selling CBD products with accompanying medical claims. *Id.*

At the time, analysts took note of the FDA's statement. For example, one article observed that the Farm Bill's passage was poised to boost Curaleaf's stock given the new Curaleaf Hemp product line, but also acknowledged that the FDA's statement could generate confusion in the cannabis industry writ large. *See* Ex. E. Other reports from January and February 2019 indicated

hesitation about setting expectations in the CBD market pending further FDA commentary, *see* Ex. F, at 2, or even noted that "[a] simple web search on the FDA's website turns up dozens of previous warning letters to CBD manufacturers making [actionable] claims," *see* Ex. G, at 75.

In short, although passage of the Farm Bill gave reason for cautious optimism about the sale of CBD products, the FDA's reaction to the Farm Bill reinforced the risk of potential FDA regulation. It remained possible that—as the Company warned in the Listing Statement—"the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug, and Cosmetic Act," and even that the FDA may issue the Company a warning letter just as it had to other CBD retailers. *See* Ex. A, at 85–86.

### E.    The Company's January 2019 Disclosure

The Company was listed on the OTCQX Best Market starting February 19, 2019. *See* AC ¶ 77(i); Ex. H. In advance, the Company filed its Canadian disclosures with OTC Markets on January 15, 2019. AC ¶ 58. This included the Listing Statement and its specific, detailed warnings about FDA regulation of cannabis-derived products.[4] This constituted yet another disclosure of the allegedly omitted risk in less than three months.

### F.    The FDA's April and May 2019 Warnings

After reaffirming its intention to regulate cannabis-derived products shortly after the enactment of the 2018 Farm Bill, the FDA announced on April 2, 2019 that it had issued three

---

[4] Although the Amended Complaint defines the putative class as "all persons or entities who purchased or acquired publicly traded Curaleaf Holdings securities on the OTCQX between November 21, 2018 and July 22, 2019 inclusive," AC ¶ 1, it was not possible for anyone to have traded shares of the Company on the OTCQX before February 19, 2019. The Amended Complaint apparently conflates the "OTCQX" market with the "OTC Pink" market, the latter of which has "no financial standards or disclosure requirements." *See Information for Pink Companies*, OTC Mkts., https://www.otcmarkets.com/corporate-services/information-for-pink-companies (last visited Mar. 6, 2020).

warning letters to companies making unsubstantiated claims about the benefits of CBD.  *See* Ex. I.

The FDA stated that the agency "stands ready to protect consumers from companies illegally selling CBD products that claim to prevent, diagnose, treat, or cure serious diseases," and that it "has and will continue to monitor the marketplace and take enforcement action as needed."  *Id.*

Thereafter, cannabis-related stocks fell across the board in late May 2019 when the Acting FDA Commissioner stated at an FDA listening session on CBD regulation that he saw "real risks" associated with THC and CBD.  *See* Ex. J.

### G.  The Company's April and May 2019 Risk Disclosures

On April 23, 2019, the Company filed another MD&A with SEDAR concerning its fourth quarter and full year earnings results (the "April 2019 MD&A").  Ex. K; AC ¶ 83.  Again, the Company explicitly warned investors about the risks of FDA regulation:

> [T]he Company's cannabis-based products are not approved by the FDA as 'drugs' or for the diagnosis, cure, mitigation, treatment, or prevention of any disease.  Accordingly, the FDA may regard any promotion of the cannabis-based products as the promotion of an unapproved drug in violation of the Food, Drug and Cosmetic Act ("FDCA"). . . .
>
> Foods and beverages, dietary supplements, pharmaceuticals, and cosmetics containing CBD are all subject to regulation under the FDCA.  The FDA has asserted that CBD is not a lawful ingredient in foods and beverages, supplements and pharmaceuticals (unless FDA-approved), although FDA has generally refrained from taking enforcement action against those products. . . . In recent years, the FDA has issued letters to a number of companies that contain CBD oil derived from hemp warning them that the marketing of their products violates the FDCA.  FDA enforcement action against the Company could result in a number of negative consequences, including fines, disgorgement of profits, recalls or seizures of products, or a partial or total suspension of the Company's production or distribution of its products.  Any such event could have a material adverse effect on the Company's business, prospects, financial condition, and operating results. . . .
>
> [Although the passage of the Farm Bill] has the effect of legalizing the cultivation of industrial hemp for commercial purposes[,] . . . .

> [t]he Company sells and distributes certain products containing
> CBD.  There is a risk that the FDA or state or local Departments of
> Health will seek to stop the Company from selling its CBD products
> or seek to have the claims made for those products revised."

Ex. K, at 46.  This represented yet another disclosure of the risks of FDA regulation in the six
months Curaleaf was a public company.[5]

The Company filed an MD&A concerning its 2019 first-quarter results with SEDAR on
May 30, 2019 (the "May 2019 MD&A").[6]  It stated that "[t]he Company's risks and uncertainties
have not materially changed from those described in the 'Risk Factors' section of the MD&A for
the year ended December 31, 2018.  Ex. L, at 32.  This explicitly incorporated the April 2019
MD&A's detailed risk disclosures, which in turn echoed the Listing Statement's initial disclosures.

### H.    The Company's Press Releases and the FDA's Warning Letter

The Amended Complaint mentions the risk disclosures discussed above, but attempts to
overwhelm them by quoting 41 Curaleaf press releases that did not reiterate those disclosures.
Ex. B to AC ("Addendum"), ECF No. 40-2.[7]  But those press releases did not contradict the risk
disclosures in the Company's securities filings; none of those press releases said anything on the
subject of FDA approval, and many did not even specifically concern Curaleaf's CBD products.

For example, on November 21, 2018, the Company announced its new "Curaleaf Hemp"
line of CBD products (the "Hemp Product Launch").  Its press release made no reference to the

---

[5] The April 2019 MD&A was filed with OTCQX on May 14, 2019. *See* AC ¶ 83.

[6] While the May 2019 MD&A itself states that it was prepared on May 30, 2019, Ex. L, at 1,
SEDAR reflects that the document was also filed on May 30, 2019.  *See Curaleaf Holdings, Inc.
(formerly          Lead          Ventures          Inc.)*,          SEDAR,
https://www.sedar.com/DisplayCompanyDocuments.do?lang=EN&issuerNo=00037057     (last
visited Mar. 6, 2020).  The May 2019 MD&A was published on OTCQX on June 5, 2019. *See
Filings and Disclosure*, OTC Markets, https://www.otcmarkets.com/stock/CURLF/disclosure
(last visited Mar. 6, 2020).

[7] As discussed *infra* page 12, one of the Addendum's 42 entries is an unnamed securities filing.

FDA or FDA approval, but instead included a variety of general statements about the quality of the products, describing Curaleaf Hemp as offering a "range of premium, natural hemp-based products designed to enhance personal health and wellness"; as meeting the "strictest quality standards" and made with "simple, natural ingredients," as "[s]upporting overall wellness"; and as "undergo[ing] strict laboratory testing" with lab results available upon request. Ex. M; AC ¶ 65. The Amended Complaint alleges that the Company's website also included statements about the health and wellness benefits of CBD. AC ¶ 66.

The Company also announced the launch of a CBD product line for pets, Bido, on May 10, 2019. As with the Hemp Product Launch, the press release announcing the new Bido line made no reference to the FDA or FDA approval. Instead, it offered general statements that "CBD has been shown in initial third-party studies to support a pet's overall wellness, including the potential to help manage pain and anxiety"; that Bido products used hemp that met the "highest industry standards" and had undergone "strict laboratory testing" with lab results available on request; and that the overall line of Curaleaf Hemp products was "high quality . . . [and] trusted" and supportive of "overall wellness." *See* Ex. N; AC ¶ 88.

During the class period, the Company continued to expand by acquiring brick-and-mortar marijuana operations. *See* AC ¶¶ 76–77, 86. Its press releases discussing this expansion and the Company's other business activities again made no reference to the FDA and no declaration or implication of FDA approval of any product, and in many instances did not mention the Company's CBD business at all. *See generally* Addendum, ECF No. 40-2.

## I.     The Amended Complaint

This action was initiated by a different plaintiff on August 5, 2019, and the appointed lead plaintiff filed the Amended Complaint on January 6, 2020. The sixty-seven-page Amended Complaint seems designed to create the impression that the Company barely mentioned the risk

of FDA enforcement action by drowning out the Company's express risk disclosures with a lengthy discussion of the legal and regulatory framework surrounding cannabis-derived products *see* AC ¶¶ 24–46, followed by quotations from snippets of press releases that discussed the quality and other positive attributes of Curaleaf products, *id.* ¶¶ 55, 57, 65–76, 88, or that addressed the Company's expansion activities, *id.* ¶¶ 61–63, 71–82.

But the Amended Complaint does not allege facts showing that any of these statements were misleading. For example, the discussion of the legal and regulatory framework with respect to cannabis products demonstrates the extent to which the risks of federal regulation were obvious and well-known to the investing public. And as mentioned above, the press releases said nothing to contradict the Company's explicit risk disclosures in its securities filings.

Instead, in an apparent effort to comply with the applicable pleading requirements, Plaintiff appends an "Addendum" identifying 42 statements that were allegedly false or misleading. *See* Addendum, ECF No. 40-2. Most of the statements identified in the Addendum are duplicates of two statements describing the nature of the Company's business, which were repeated with limited modifications in dozens of press releases. These statements described the Company's products as meeting "the highest standard for safety, effectiveness, consistent quality and customer care" or as "known for quality, trust and reliability." *See generally id.* The Addendum also identifies a handful of other allegedly misleading statements in the Company's press releases, to the effect that its products were subject to "strict laboratory testing," *id.* at 2, 18, were "natural," *id.* at 1, supported "overall wellness," *id.* at 1–2, 18, were "diverse medical-grade products," *id.* at 9, were "made using the industry's cleanest, most medically precise extraction and purification methods," *id.* at 16, or were "the first in the cannabis industry to receive the Safe Quality Food certification under the Global Food Safety Initiative," *id.* at 3–8. Besides these press releases, the Addendum

identifies an unnamed document that allegedly failed to identify applicable regulatory risks, which from context refers to the November 2018 MD&A. *See* AC ¶ 75; Addendum, ECF No. 40-2, at 4.

Taken together, the Amended Complaint and Addendum allege only that Curaleaf issued statements that "created the impression, for investors, that Curaleaf Holdings' cannabis products were of a high quality, safe, effective and had the health/medical benefits Curaleaf Holdings advertised, without clarifying that the federal body responsible for overseeing the quality, safety and effectiveness of medical and food products in the U.S. had not approved these products." *Id.* ¶ 92. But for any investor to have gotten the "impression" that the relevant "federal body . . . had not approved these products," she would have had to completely disregard the regular, detailed risk disclosures in the Company's securities filings.

## LEGAL STANDARDS

The elements of a claim for securities fraud under Section 10(b) and Rule 10b-5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013).

In pleading these elements, a securities fraud complaint must allege facts sufficient "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

Securities fraud claims are also subject to the "[e]xacting pleading requirements" of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief that a statement is misleading was 'formed' and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

## ARGUMENT

The Amended Complaint does not adequately allege material misrepresentations or omissions, scienter, or facts that would allow the Court to determine that the over-the-counter trades at issue were "domestic transactions" subject to Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5.

I.      **The Amended Complaint Does Not State a Claim for Securities Fraud.**

A.      **The Amended Complaint Does Not Adequately Allege Any False or Misleading Misrepresentation or Omission.**

The Amended Complaint must be dismissed because the allegedly omitted risks were repeatedly and expressly disclosed by the Company and were well-known to investors as a result of information in the public domain, and because the alleged fraudulent statements would not have been actionable even without these disclosures.

1.      **The Company Disclosed the Information It Allegedly Omitted.**

In this case, the Company's statements could not have misled reasonable investors for a simple reason: the Company disclosed the risk of FDA regulation from the beginning.  Because the Company's securities filings repeatedly put investors on notice of the fact that its products were not FDA-approved and were thus subject to potential FDA regulation, the Company was not required to repeat the same information in every press release.

Courts regularly hold that an issuer's public statements could not have misled investors in light of the issuer's other disclosures. For example, Judge Ross's decision in *In re KeySpan Corp.* addressed whether KeySpan had fraudulently obscured the fact that, due to a merger, it would be regulated under the Public Utility Holding Company Act (PUHCA) and would need to divest certain business interests. 383 F. Supp. 2d 358, 361–62 (E.D.N.Y. 2003). Similar to here, the plaintiffs alleged "that throughout the class period, every public statement made by the Company was false and misleading because defendants failed to make full disclosure regarding its impending regulation" under the Act, including optimistic statements about the merger that would subject KeySpan to PUHCA in the first place. *Id.* at 376. Judge Ross rejected this claim because KeySpan had repeatedly disclosed in its regulatory filings that it would be subject to PUHCA, and that this may affect its ability to pay dividends or require it to divest specific non-utility interests. *Id.* at 376–79. In light of these disclosures, not every public statement by KeySpan needed to spell out the risk that it would be required to divest those interests—even when promoting the benefits of the merger that led to PUHCA regulation. *Id.* at 378–79. In short, as here, "the Company publicly acknowledged the very information that plaintiffs contend[ed] it concealed." *Id.* at 379. Other courts have similarly dismissed securities fraud actions based on an issuer's on-point disclosures. *See, e.g.*, *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 247–50 (E.D.N.Y. 2019) (holding that investors could not have been misled about a mutual fund's exposure given its repeated disclosures that its portfolio included uncovered call options).

Other courts have dismissed claims for the same reason as a matter of materiality, holding that because the issuer provided allegedly omitted information in prior disclosures, further disclosure would not alter the "total mix" of information available to a reasonable investor. *See, e.g.*, *Beleson v. Schwartz*, 419 F. App'x 38, 40–41 (2d Cir. 2011) (holding that through the

defendant's other disclosures and press coverage, "the market was adequately informed" of the relevant information); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333–34 (S.D.N.Y. 2014) (holding that an issuer had not fraudulently misrepresented the likelihood of FDA approval because it had "consistently g[iven] warnings that the FDA might not approve the Defendants' product, and no reasonable investor could have believed that there was no risk in this regard").

Here, the Company repeatedly disclosed the only information the Amended Complaint suggests it should have disclosed: that the FDA had not approved the Company's products and the Company was therefore at risk of FDA regulation. It did so in its Listing Statement in October 2018 (Ex. A, at 85–86), in its January 2019 filing with the OTCQX (AC ¶ 58), and again in its April 2019 MD&A (Ex. K, at 46). It further referred investors to these disclosures in its November 2018 and May 2019 MD&As. *See* Exs. C, L. A reasonable investor exercising minimal diligence could not have believed these products were FDA-approved or were not at risk of FDA regulation.

The Amended Complaint tries to side-step these disclosures by suggesting the Listing Statement was "inadequate to inform U.S. based investors of risks" because it was not filed with OTCQX until January 15, 2019. AC ¶ 93. But the Listing Statement and other disclosures were, at all points, easily accessible to U.S.-based investors on SEDAR. *See* AC ¶ 58; *cf.* 17 C.F.R. § 240.12g3-2(b)(2) (granting a foreign private issuer various exemptions if it publishes certain home market disclosures in English "through an electronic information delivery system generally available to the public in its primary trading market"). Further, filing the Listing Statement with OTCQX in January 2019 gave prospective investors ample time to review the disclosures on that platform before the Company began trading on OTCQX on February 19, 2019. AC ¶ 77(i).

Plaintiff also contends that the April 2019 MD&A came too late because it was filed with OTCQX in May 2019. *Id.* ¶ 116. This argument simply ignores the fact that the same disclosures

were available even before the initial October 2018 offering, and that the Company reiterated those disclosures in November 2019 in connection with the third quarter results and again in January 2019 in connection with the initial OTCQX listing.

As another attempt to avoid the preclusive effect of the Company's disclosures, the Amended Complaint argues that the Listing Statement's disclosures were rendered obsolete by the 2018 Farm Bill. AC ¶¶ 93–94, 112. But nothing in the Farm Bill made the Listing Statement misleading—if anything, the Amended Complaint's allegations make clear that in response to the Farm Bill, the FDA reiterated the risk of regulating CBD products. *See id.* ¶ 93 (describing the FDA as stating that it "continued to exercise the authority to approve cannabis food and medical products"); *id.* ¶ 112 (describing the Farm Bill as "retaining" the FDA's regulatory authority). Because there was no intervening change in the regulatory scheme, the Company's previous disclosures were not materially misleading, and the Company had no duty to update its past statements. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 303–04 (S.D.N.Y. 2010) (recognizing that a duty to update is triggered only if intervening events make the initial disclosure misleading).

Nor did the Company's introduction of the Curaleaf Hemp and Bido products render the Company's previous disclosures misleading. The Listing Statement warned from the beginning that Curaleaf's products were not approved by the FDA and may be regulated as unapproved drugs. *Cf. Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 234 (S.D.N.Y. 2018) ("Having addressed these issues in general terms, Defendants did not omit material facts by failing to address, in more granular terms, every eventuality.").

The Amended Complaint also alleges that the November 2018 MD&A misled investors by failing to disclose the risk of FDA regulation. *See* AC ¶¶ 46, 92–95; Addendum, ECF No. 40-2,

at 4. But the November 2018 MD&A regarded the quarterly period ending on September 30, 2018, *before* the business combination resulting in the Company's cannabis business. Thus this filing addressed only the risks associated with the Company's mining operations, and it expressly disclosed to investors that they should review the Listing Statement for risks associated with its post-combination cannabis operations. Ex. C, at 8. A reasonable investor could not have read the risk factors identified in the November 2018 MD&A—all of which pertained to *mining*—and concluded that there were no risks associated with the *cannabis* business.

Despite the Amended Complaint's creative efforts to minimize the Company's disclosures, those disclosures were obviously sufficient to warn investors about the fact that the Company's products were not approved by the FDA and the consequent risks of FDA regulation.

### 2. The Allegedly Omitted Information Was in the Public Domain.

As an independent ground for dismissal, the allegedly omitted information was also widely available in the public domain. Thus, even if the Company had not repeatedly disclosed the risk of FDA regulation, the Amended Complaint would be insufficient.

"Although the underlying philosophy of federal securities regulation is that of full disclosure, 'there is no duty to disclose information to one who reasonably should be aware of it.'" *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *see also Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109–10 (2d Cir. 2005) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."). So, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain[,] . . . a defendant may not be held liable for failing to disclose this information." *KeySpan Corp.*, 383 F. Supp. 2d at 377.

Courts therefore will dismiss securities fraud claims where the relevant information was a matter of readily accessible public record. *See, e.g.*, *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 255 (S.D.N.Y. 2019) (defendant was not required to disclose complex but publicly available facts about Japanese markets); *In re Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 576–77 (holding that news articles disclosing relevant information undercut a securities fraud claim); *see also In re Andrx Corp.*, 296 F. Supp. 2d 1356, 1367–69 (S.D. Fla. 2003) (holding that failure to disclose risk of FDA non-approval was immaterial because analyst reports and press releases "repeatedly advised" that the drug launch could be delayed by lack of FDA approval).[8]

Here, a reasonable investor would have been aware of the exact information Plaintiff alleges the Company fraudulently omitted: the Company's CBD products were not FDA-approved and therefore were subject to potential regulation. As described above, reasonable investors would have been aware of the FDA's own, persistent statements that it could potentially take regulatory action against unapproved cannabis-derived products, and that it had not yet decided whether and how to approve them. *Supra* pages 2–3, 6–8; *see* Exs. B, D, I; *see also* Ex. J (noting that cannabis industry stocks fell across the board in May 2019 after the FDA agency head expressed concerns about CBD safety). "Reasonable investors thus had ready access to the very information that the plaintiffs assert should have been disclosed[,] and the defendants are not liable for failing to reiterate that information." *In re Bank of Am. AIG Disclosure*, 980 F. Supp. 2d at 577.

---

[8] Courts have held that publicly available information was insufficient to defeat a securities fraud claim only where the information was available in "sporadic" coverage that did not "clarify or contextualize" an alleged misstatement, *see N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*, 709 F.3d 109, 126–27 (2d Cir. 2013), or where the defendant allegedly concealed other information within its control, *see Barilli*, 389 F. Supp. 3d at 255 (distinguishing cases); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *15–16 (D.N.J. 2015) (finding a potential fact issue where the publicly available information involved a complicated set of foreign regulations and the plaintiffs alleged that the defendants had "repeatedly and directly obfuscated the impact" of those regulations). That is not the case here.

### 3. The Company's Promotional Statements Would Not Be Actionable Even in the Absence of Disclosures.

The Amended Complaint and Addendum allege that promotional statements about the Company's CBD products somehow conflicted with the fact that the products were not FDA-approved. In the first instance, those statements were not misleading, because they must be read in tandem with the Company's own risk disclosures in its securities filings, *KeySpan Corp.*, 383 F. Supp. 2d at 377–78, as well as with the information in the public domain, *see id.*; *Barilli*, 389 F. Supp. 3d at 254–55, all of which made the risk of FDA regulation crystal-clear.

But even putting that other information to the side, those statements were not misleading because no "reasonable investor would have received a false impression." *See In re Investment Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Generalized statements about a company's products will not be deemed to mislead investors about a specific risk of governmental action. For example, in *Tongue v. Sanofi*, the Second Circuit rejected a securities fraud claim against a company that spoke about the "safety and efficacy" of its drug, despite the FDA having warned the company about its preference for double-blinded trials. 816 F.3d 199, 203, 206 (2d Cir. 2016). The court concluded that the plaintiffs "fail[ed] to demonstrate any conflict" between "statements about the general effectiveness of [the drug] and the FDA's methodological feedback," making clear that promotional statements about drug safety or effectiveness do not inherently implicate likelihood of FDA approval. *Id.* at 214.

In other words, where the Company's statements "convey[ed] no information" about FDA approval or about whether the products met the FDA's standards, "[n]o reasonable investor could have been [misled] to believe something in contradiction to the omitted facts." *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011); *see also Gregory v. ProNai Therapeutics, Inc.*, 297 F. Supp. 3d 372, 401 (S.D.N.Y. 2018) (holding that it was not misleading

to promote a drug's efficacy without discussing the negative results of a clinical safety trial, because the safety results were not required to make the discussion of efficacy non-misleading); *Gaines v. Guidant Corp.*, No. 1:03CV00892-SEB-WTL, 2004 WL 2538374, at *11 (S.D. Ind. Nov. 8, 2004) ("None of the excerpts selected by Plaintiffs mention quality control standards, the FDA or regulatory compliance. Thus, no investor could reasonably conclude, based on the news releases, that [the company] had no pending FDA issues." (internal quotation marks and alterations omitted)). Here, the Company's statements "convey[ed] no information" about whether its products were or would be deemed safe and effective in the eyes of the FDA. *In re Sanofi-Aventis*, 774 F. Supp. 2d at 569. No reasonable investor would plausibly infer from these statements that the Company's products were FDA-approved or were not at risk of regulation.

By the same token, "vague and optimistic statements that are too general to cause a reasonable investor to rely upon them . . . cannot serve as the basis for a securities fraud claim." *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 497 (2d Cir. 2019) (internal quotation marks omitted); *see City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y. 2019) (holding that statements were "plainly puffery" because they were "unverifiable claims upon which no reasonable investor could rely").

For all these reasons, the Amended Complaint fails to adequately allege that any of the challenged statements were false or misleading to investors.

### B. The Amended Complaint Does Not Adequately Allege Scienter.

Scienter in a securities fraud claim is subject to a particularly difficult pleading standard, because the PSLRA radically revises the normal presumptions applicable to a motion to dismiss. Rather than give the plaintiff the benefit of any adverse inference, the Court must give equal weight to inferences favoring the defendants. The PSLRA requires a plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

U.S.C. § 78u-4(b)(2)(A).  After *Tellabs, Inc. v. Major Issues & Rights, Ltd.*, to survive a motion

to dismiss, a securities fraud complaint must allege facts giving rise to an inference of scienter that

is "cogent and at least as compelling as any opposing inference one could draw from the facts

alleged."  551 U.S. at 324.  In applying this standard, "a court must consider plausible, nonculpable

explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.*  This

analysis is both "holistic[,]" in the sense that the Court must consider all allegations and inferences,

*see id.* at 326, and "comparative," in the sense that the Court must weigh the inference of scienter

against the inference that the defendants did not act with the required state of mind, *see id.* at 323.

In the Second Circuit, courts have held that plaintiffs can adequately plead scienter only

by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting *ATSI Commc'ns,

Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).[9]  Where motive allegations are absent,

"the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be

correspondingly greater."  *ECA, Local 134 IBEW Joint Pension Tr.*, 553 F.3d 187, 198–99 (2d Cir.

2009) (internal quotation marks omitted).  The Amended Complaint does not attempt to plead that

Defendants had the motive to commit securities fraud.  *See* AC ¶¶ 107, 119–21.  It therefore must

present "correspondingly greater" circumstantial evidence of recklessness, which it cannot do.

---

[9] The "holistic" analysis required by *Tellabs* means that these tests should not be applied in the disjunctive. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109–10 (2d Cir. 2009) ("In passing the PSLRA, Congress . . . did not adopt our motive-and-opportunity gloss for the pleading of intent or our alternative standard of recklessness."); *see also Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) (collecting cases concluding the PSLRA "strengthens the Second Circuit's standard by rejecting the simple pleading of motive and opportunity").

Under the "conscious misbehavior or recklessness" test, "recklessness is defined as at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Local 134*, 553 F.3d at 199; *see also Stratte-McClure*, 776 F.3d at 106 (holding that a complaint must "show conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence" (internal quotation marks omitted)). Where an omission is concerned, the complaint must "present facts indicating a clear duty to disclose." *Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001); *see also Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016) (holding that in the case of a duty to disclose based on the need to make other statements non-misleading, a plaintiff "must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility").

Under these standards, Plaintiff cannot show that any of the allegedly false statements or non-disclosures were made with scienter. Defendants were justified in believing that the Company's own express disclosures of the risk of FDA regulation, as well as other publicly available information on the same topic, were more than sufficient to make investors aware of the relevant information. Moreover, Plaintiff has not alleged that the Company held non-public information that it deliberately withheld from investors. *See, e.g.*, *Kalnit*, 264 F.3d at 143 (holding that "the duty to disclose . . . was not . . . clear, especially given that the public was aware of" information affecting the materiality of the omission); *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 509–10 (E.D. Pa. 2018) ("Plaintiffs' scienter allegations are undermined by the public nature of the regulations. . . . [g]iven that the legal requirements for labeling exclusivity are

publicly-available in federal statutes and regulations, and Plaintiffs do not allege that Defendants possessed any insider or confidential knowledge beyond what was 'publicly available[.]'").

Under these circumstances, the most compelling inference is that the Company took its disclosure obligations seriously and made a reasoned decision that it was not required to reiterate the potential for FDA regulation every time it made public statements about its products. Instead, its "[p]rior, extensive public disclosures weigh against an inference of scienter." *In re GLG Life Tech Corp. Sec. Litig.*, No. 11 Civ. 9150 (KBF), 2014 WL 464762, at *6 (S.D.N.Y. Feb. 3, 2014).

Indeed, the Amended Complaint's own explanation for the Company's statements is not that Defendants acted with reckless disregard for an obvious duty to disclose, but rather that it was confused by the changing regulatory regime surrounding cannabis-derived products. The Amended Complaint avers that "[i]n light of the complex cannabis regulatory regime in the U.S. and Defendants' confusion about it, Defendants should have exercised caution in proceeding, taken further steps to warn investors of the risks and/or researched further what the regulatory regime required." AC ¶ 114. Given that the Amended Complaint itself concedes that a plausible explanation for Defendants' alleged fraud was that Defendants were simply confused by the regulatory scheme, the Amended Complaint should be dismissed.

## II. The Amended Complaint Does Not Adequately Allege Domestic Transactions.

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court held that Section 10(b) does not apply extraterritorially, but rather only to deceptive conduct in connection with "transactions in securities listed on domestic exchanges[ ] and domestic transactions in other securities." 561 U.S. 247, 267 (2010).

Plaintiff cannot meet *Morrison*'s first prong because the OTCQX does not constitute a "domestic exchange." *See In re Petrobras Sec.*, 862 F.3d 250, 256–57 (2d Cir. 2017) (affirming the district court's holding that OTC markets do not meet the first *Morrison* prong). Other recent

case law confirms that OTC trades do not take place on "domestic exchanges" for the purposes of *Morrison*. *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 946–47 (9th Cir. 2018); *United States v. Georgiou*, 777 F.3d 125, 134–35 (3d Cir. 2015).

Plaintiff must therefore demonstrate that the relevant transactions were "domestic transactions"—that is, that "the purchaser incurred irrevocable liability within the United States to take and pay for a security, . . . the seller incurred irrevocable liability within the United States to deliver a security[,] . . . . or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). This requires sufficient allegations "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70. Courts regularly dismiss claims for failing to allege sufficient facts to support a conclusion that the relevant transactions were domestic. *See, e.g.*, *id.* at 63, 69–70; *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340-43 (S.D.N.Y. 2015); *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 457–59 (S.D.N.Y. 2013).

The Amended Complaint offers no way to conclude that the underlying transactions were "domestic transactions" under the operative definition. Thus, Plaintiff has not alleged facts sufficient to overcome *Morrison*'s bar on extraterritorial application of Section 10(b).

## III. The Amended Complaint Does Not Adequately Allege Control Person Liability.

Plaintiff's claim against the Individual Defendants for control person liability also fails as a matter of law. To plead control person liability, a complaint must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenter's Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). As explained, the Amended Complaint fails to allege a primary violation by Curaleaf Holdings. Its

claim against the Individual Defendants must fall as well.  *See, e.g.*, *City of Warren Police & Fire Ret. Sys.*, 412 F. Supp. 3d at 228–29.

## IV.     Granting Leave To Amend Would Be Futile.

The Court "has discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009).   "An amendment is considered futile where the plaintiff is unable to demonstrate [the ability] to cure the defects in a manner that would survive a motion to dismiss." *Jackson v. Wells Fargo Home Mort.*, No. 15-CV-5062 (PKC) (ST), 2018 WL 8369422, at *13 (E.D.N.Y. Aug. 10, 2018).  Futility is especially clear when "[t]he problem with [a plaintiff's] causes of action is substantive" and "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Here, the deficiencies in the Amended Complaint go beyond inartful pleading: the core allegations demonstrate that the Company disclosed precisely the risk that was allegedly omitted. Accordingly, the Company's statements were not misleading, and the Company did not act with scienter.  The Court should dismiss the Amended Complaint with prejudice.

Dated:  March 6, 2020

Respectfully submitted,

JENNER & BLOCK LLP

By:  /s/ Stephen L. Ascher

Stephen L. Ascher (SA7820)
Andrew J. Lichtman (AL1208)
Jeremy H. Ershow
Allison N. Douglis
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
Phone: 212-891-1600
Fax: 212-891-1699
sascher@jenner.com
alichtman@jenner.com
jershow@jenner.com
adouglis@jenner.com

*Attorneys for Defendants*